58 So.2d 608

**DOUGLASS v. STATE.**

3 Div. 618.

Supreme Court of Alabama.
March 10, 1952.

Rehearing Denied May 15, 1952.

T. Lomax Crum, Montgomery, for appellant.

Si Garrett, Atty. Gen., L. E. Barton, Asst. Atty. Gen., and Chas. C. Carlton, Montgomery, of counsel, for the State.

BROWN, Justice.

The appellant was tried on an indictment returned by a grand jury impaneled in the Circuit Court of Montgomery County, charging him with murder in the first degree, substantially in the form prescribed by the statute. Code of 1940, Title 15, § 259, Form 79, p. 429. The person alleged to have been killed was William Patterson and the means by which the offense was committed, as alleged in the indictment, was "by cutting him with a knife" and was sufficient compliance with the statute. Gaines v. State, 146 Ala. 16, 41 So. 865; Sims v. State, 176 Ala. 14, 58 So. 379; Moody v. State, 94 Ala. 42, 10 So. 670. The verdict of the jury was for murder in the first degree and the punishment fixed at death. The appeal comes to this court under Chapter 18, Title 15, § 382, Code of 1940, providing for automatic appeals from death sentences, subsection 10 of which provides:

"In all cases of automatic appeals the appellate court may consider, at its discretion, any testimony that was seriously prejudicial to the rights of the appellant, *and may reverse thereon even though no lawful objection or exception was made thereto*. The appellate court shall consider all of the testimony, and if upon such consideration is of opinion the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust and that upon that ground a new trial should be had, the court shall enter an order of reversal of the judgment and grant a new trial, though no motion to that effect was presented in the court below." [Italics supplied.]

The requirements of said statute are supplemented by the provisions of § 389 which is a part of the same chapter and which provides *inter alia*, "the court must consider all questions apparent on the record or reserved by bill of exceptions, and must render such judgment as the law demands."

The appeal is prosecuted on the record proper and the duly authenticated transcript of the proceedings of the trial including the oral charge of the court, testimony of the witnesses and exhibits thereto, consisting of several photographs of the body of the deceased taken by the Coroner of Montgomery County, Dr. Kirkpatrick, the charges given at the request of the defendant's attorney and those requested and refused. The transcript was approved by the trial judge.

The evidence is without dispute that both the deceased and the defendant were inmates of Kilby Prison, Montgomery, Alabama; that deceased was operating within the prison walls of the Negro department of said prison what was referred to in the evidence as a "commissary", where he kept articles for sale to Negro inmates. The deceased stated to defendant before the fatal rencounter, in substance, that he (deceased) "could not afford to take the rap on account of the money order, that his business was too valuable and he had to take care of 'my boys'."

The defendant also testified that deceased handled all "hot stuff" which he sold at half price. The defendant further testified that deceased had access to the mail received at the branch post office maintained in the Negro department of the prison through which the mail to the inmates was handled. The defendant further testified, and his testimony is not disputed, that he had the privilege of the corridors inside the walls and on the front as clean-up boy; that the only access he had to the post office was to sweep it out, that he handled no mail; that he had been recommended as a trusty by some of the guards for whom he worked and that the warden had made some promise to give effect to this request in the near future.

The evidence further goes to show that when an inmate of the prison is found guilty of serious violation of the prison rules they are deprived of all their liberty and placed in solitary confinement, which has acquired the appellation among the prisoners of "Alcatraz," and which is much dreaded by them.

So far as appears from the evidence there was no conflict or enmity between the deceased and the defendant up to and immediately preceding the fatal rencounter in which the deceased knocked the defendant down and the defendant inflicted several stab and incised wounds on deceased's person with a small pocket knife which the defendant had in his pocket before the fight began. Said wounds caused Patterson's death in a short time thereafter, approximately within a quarter to a half hour. The evidence shows that there was some delay in getting the wounded man to the prison hospital and he died on the stretcher immediately after he was carried into the hospital from a blood clot or from loss of blood.

The chain of incidents antecedent to and immediately preceding and leading up to the fatal rencounter, as the evidence shows, were as follows: A postal money order received at the post office within the prison walls, the department wherein the deceased, the defendant and other Negro convicts were kept, had been surreptitiously abstracted from the said post office, which

was traced by the warden to the possession of the deceased. In his investigation the warden questioned the deceased and he told the warden that he received the money order from the defendant. This accusation was denied by the defendant in the presence of the warden. The warden then told deceased to go into the waiting room, that he (the warden) would talk to the defendant. After the defendant again denied any knowledge of or connection with the stolen money order, the warden ordered his deputy to lock the defendant up and let him think it over. The deputy warden instructed the defendant to wait in the corridor while he (the deputy) went to the gate to get the key. While the deputy was absent on his mission, the defendant went into the waiting room, according to the defendant, to get his tooth brush and some other articles from a drawer where he kept such articles for use while in solitary confinement and started out of the room. As the defendant passed by the deceased he said to Patterson, "Why you frame me about that money order? You know I didn't give you no money order." Deceased replied, "I didn't frame you, you framed yourself. I can't afford to take the rap and be put back in Alcatraz. I got too good a start in my business and got to protect my boys." At this juncture the scuffle started. The deceased knocked the defendant against the wall and the defendant inflicted on the deceased several wounds with a small pocket knife, which he had in his pocket when the fight started. The defendant suffered an injury to his shoulder.

The eyewitnesses testified that nothing was said and when they observed the scuffle, they thought they were just playing. There is an absence of evidence as to which of the combatants struck the first blow. Both were strong muscled and the tendencies of the evidence show that the deceased was larger than the defendant.

The defendant testified that the deceased said:

" 'I don't want to take no rap. I got too many employes, too good a start in store to get back in Alcatraz.' He hadn't been out of Alcatraz more than three months."

The following questions were asked by defendant's counsel:

"Q. What did he say to that? A. After I got my sweat shirt I said, don't need nothing to go up there with, put all my stuff back in the box, started out the door. He said something concerning his boys again; I had a little old knife and just losed my head.

"Q. Lost your temper? A. Yes, sir, I cut him good and, gentlemen of the jury, I didn't intend to kill him, that is a fact. I got mad about something I knowed nothing about. Both guards, both talked up for me and got trustee jobs, I been out on the same job, been working between the gates seven or eight different times, none of them say I stole anything.

"Q. You ever seen that money order at all? A. Seen them when Captain Carl Williams had it.

"Q. Is that the only time you seen it? A. Yes, sir, only time I ever seen it.

\*  \*  \*  \*  \*  \*

"Q. Did you go in that room with the definite intention of killing Pat? A. No, sir, I didn't.

"Q. It made you mad you knew you had to go to Alcatraz? A. Just messed everything up, what Captain Carl promised me.

"Q. Taken all your privileges away? A. Yes, sir, something I didn't know nothing about.

"Q. And then you started cutting on him; that is what happened? All right. \* \* \*"

Upon cross-examination of the defendant by the solicitor the following occurred:

"Q. In 1940—in 1943 you were convicted of burglary and grand larceny; is that right? A. That was burglary and grand larceny in '48.

"Q. Weren't you convicted in 1943 of burglary and grand larceny? A. Yes, sir.

"Q. *How many years in the penitentiary were you given, convicted on three cases? A. Six.*

"Q. Six cases? A. Six years.

"Q. Now, in 1948 you were convicted and given how many years? A. Nine.

"Q. Nine years; 1950 you were convicted of murder in the second degree? A. Yes, sir.

"Q. Given how many years? A. Thirty-five years.

"Q. Thirty-five; that actually was while you were a convict at Atmore, wasn't it? A. Yes, sir.

"Q. Killed another inmate down there.

"Mr. Crum: If he is going into that I have a right to ask him about that other murder.

"The Court: The only reason he can go into that is on the proposition of how much credibility to attach to his testimony. It shouldn't influence the Jury in any way as to his guilt or innocence in this case, but how much credence is to be given it.

"Q. Juror: You say this is the second?

"Mr. Crum: This is a second offence, yes.

\*    \*    \*    \*    \*    \*

"A. When I thought about being framed I just about lose my head.

"Q. You pulled the knife out then? A. Yes, sir.

"Q. And you cut him to death? A. I don't know, sir, if I cut him to death, I cut him.

"Q. Didn't you, in your statement to the Sheriff's office say while you were cutting on him he just laid down and died?

"Mr. Crum: We object to that; there is no evidence about that.

"The Solicitor: This is cross-examination.

"Mr. Crum: You didn't introduce it.

"The Solicitor: Cross-examination.

"The Court: I will let him answer; it is on cross-examination.

"Mr. Crum: Go ahead.

"Q. Didn't you tell one of the Deputy Sheriffs, Mr. Sweeney, while you were cutting on him he laid down— A. He came down one night, how killing, not going to plead not guilty, nothing, tell you—all how it was—

"Q. Just answer my question; you told him while you were cutting on him he just laid down and died on you, didn't you? A. Yes, sir, I told him something or other like that, sir.

"Q. How long had you had that knife? A. About two weeks.

"Q. About two weeks; when you started cutting on William Patterson he didn't have a knife in his hand? A. I really didn't know, sir. I wasn't taken no—

"Q. You didn't get hurt at all? A. No, sir, except I had a scar on back of my shoulder where I bumped on the side of the wall when he knocked me down. \* \* \*" [Italics supplied.]

The only deputy sheriff examined as a witness for the state was George A. Mosely who testified in response to the solicitor's questions:

"Q. Did you talk to the defendant? A. I didn't talk to him that afternoon; I talked to him next day.

"Q. When you talked to him at that time, were any threats, coercion, promise of record or other inducement made? A. None whatever.

"Q. Did he admit to you that he killed William Patterson? A. Yes, sir, he did.

"Mr. Crum: What did he say? Solicitor, did he admit to you that he killed William Patterson, was the question." [Italics supplied.]

The solicitor, on the cross-examination of the defendant, asked him:

"Q. Didn't you in your statement to the sheriff's office say while you were cutting him he just laid down and died?

"Mr. Crum: We object to that: there is no evidence about that.

"The Solicitor: This is cross examination.

"Mr. Crum: You didn't introduce it.

"Solicitor: Cross examination.

"The Court: I will let him answer that on cross examination.

"Q. Didn't you tell one of the deputy sheriffs, Mr. Sweeney, while you were cutting he laid down?"

■ This question was objectionable. No predicate was laid and it was not shown that this statement was made on the same occasion testified to by deputy Mosely or in fact that Mosely was present at the said time and place.

■ In Dyer v. State, 241 Ala. 679, 683, 4 So.2d 311, 313, the court observed: "No confession of guilt should be allowed to go to the jury unless it appears, either from surrounding circumstances or from positive evidence, that the confession was freely and voluntarily made. In this State confessions are prima facie involuntarily made, and there must therefore be evidence addressed to the trial judge (unless the circumstances attending the confession show that it was voluntary) rebutting that presumption and showing prima facie that the confession was voluntarily made. Godau v. State, 179 Ala. 27, 60 So. 908."

To this end the burden was on the state. Jackson v. State, 226 Ala. 72, 145 So. 656; Redd v. State, 69 Ala. 255, 259; Murphy v. State, 63 Ala. 1; Porter v. State, 55 Ala. 95.

■ It was permissible for the solicitor on cross-examination of the defendant, after he had voluntarily taken the stand to testify as a witness, to ask the defendant if the deceased while the defendant was cutting him didn't "lay down" or "didn't lay down and die", but the question put to the defendant did not seek to elicit such fact. It called for a statement made to Sweeney at a time not stated in the question going to show a confession of guilt.

■ While it is well settled that, "When the defendant in a criminal case avails himself of the statutory privilege of testifying as a witness (Sess.Acts 1884, 5, p. 139), he subjects himself to the test of cross-examination as to any matter connected with the transaction, or pertinent to the issue, and impeachment by evidence assailing his general character, or by proof of contradictory statements on other occasions; but he can not be cross-examined, against his objection, as to his connection with, or commission of other offenses, or matters which would unduly prejudice him in the minds of the jury,—as by asking whether he did not 'belong to the Jesse James gang.'" Clarke v. State, 78 Ala. 474 (9th Headnote). The Clarke case has been cited with approval and has not been criticized or overruled. Gast v. State, 232 Ala. 307, 311, 167 So. 554; Shepard's Annotations.

■ The defendant by taking the stand does not waive the burden resting on the State to show that a confession made by him was voluntary.

■ Dr. M. B. Kirkpatrick, the Coroner of Montgomery County, as a witness for the State was examined in respect to the body of the deceased, as to the knife wounds appearing thereon. He also identified the photographs of the deceased's body taken at the prison hospital by the witness and identified his report to the prison authorities. The photographs were offered and received in evidence. On cross-examination by Mr. Crum the following occurred:

"Q. Doctor, this report that you made here, 'Kilby Prison', that is your handwriting, is it not? A. Yes, sir.

"Q. 'William Patterson, the deceased'; underneath that 'bad record'; that is your handwriting? A. Yes, I think that was intended for this down there.

"The Solicitor: What was it intended for, Doctor?

"Mr. Crum: Wait a minute; that is on there. I can cross-examine.

"Q. (Mr. Crum): Underneath the name of the nigger you have written the words 'bad record'; you haven't written that under Joe Douglass; all right, sir, you can have it; * * *."

On redirect examination by the solicitor the following occurred:

"Q. I want to ask you one question, Doctor; on this report, you say you have the words 'bad record'; who did you intend that to refer to? A. I tell you, on these cases, where so many men and so many people are trying to tell the Coroner thus, why and who, you get rather mixed up on which is the aggressor and which is not. And, William Patterson was the dead man. *I was informed by several people out there that Joe Douglass had a bad record; he had killed one or two men prior.*" [Italics supplied.]

This testimony was wholly immaterial, was calculated to inflame the minds of the jury and while it was permissible for the solicitor to cross-examine the defendant touching his previous convictions for crime involving moral turpitude, as affecting his credibility as a witness, it was not permissible to go into the details of the previous offenses and inject into the evidence that an offense was committed by the defendant while he was a convict at Atmore and that the person killed was "another inmate down there." This could only inflame the minds of the jury to the great prejudice of the defendant. That immediate effect was developed, provoking the inquiry from a juror, "You say this is the second one?" Code of 1940, Tit. 7, §§ 434, 435; Ellis v. State, 244 Ala. 79, 11 So.2d 861.

█ The photographs showing the wounds inflicted on the body of the deceased and the pocket knife used in inflicting such wounds were identified by the testimony and were admitted in evidence without error. McKee v. State, 253 Ala. 235, 44 So.2d 781; Maund v. State, 254 Ala. 452, 48 So.2d 553.

█ The case as presented by the evidence on its various phases as to murder in the first and second degree and manslaughter in the first degree, was for the jury. Therefore special charges 1, 2, 3 and 4 requested by the defendant were properly refused by the court.

█ It is conceded in brief of the Attorney General, and correctly so, that whether or not the killing was the result of passion suddenly aroused by sufficient provocation, was for the jury. As to this phase of the evidence the court's oral charge clearly and concisely stated the law of the case. Easley v. State, 246 Ala. 359, 20 So.2d 519; Reeves v. State, 186 Ala. 14, 65 So. 160; Smith v. State, 83 Ala. 26, 3 So. 551, 552.

█ Charge 3-A, given at the request of the defendant, is in conflict with the oral charge in that if the jury after consideration of all the evidence entertained a reasonable doubt as to whether the killing was with malice aforethought, the defendant was entitled to be acquitted of murder in the first degree. It could have well been refused. It was enough to justify its refusal that it did not speak "in the correct and appropriate terms of the law." Bush v. State, 211 Ala. 1, 100 So. 312, 313; Hudson v. State, 217 Ala. 479, 481, 116 So. 800. However the reversal of the case is not rested upon the giving of Charge 3-A for the defendant, but for the errors of the court in allowing the solicitor to go into the details of the former conviction of the defendant for murder and the evidence given by Dr. Kirkpatrick as to what he was informed by several people as to the reputation of the appellant.

Reversed and remanded.

FOSTER, LAWSON, SIMPSON and STAKELY, JJ., concur.