111 So.2d 621

Jewel Pearl DUFF

v.

STATE.

6 Div. 548.

Court of Appeals of Alabama.

Oct. 21, 1958.

Rehearing Denied Nov. 18, 1958.

81

de Graffenried, de Graffenried & de Graffenried, Tuscaloosa, for appellant.

John Patterson, Atty. Gen., and Jas. W. Webb, Asst. Atty. Gen., for the State.

CATES, Judge.

The January, 1957, Tuscaloosa County Grand Jury indicted Jewel Pearl Duff for first degree murder in killing Herbert Riddle by shooting him with a pistol.

She appeals her conviction of murder in the second degree, for which she was sentenced to twenty years' penal servitude, and from the overruling of her motion for a new trial.

The tendency of the prosecution's case was:

April 19, 1957, about 10:30 or 11:00, P.M., Dr. A. W. Davidson examined Riddle, a seventeen year old boy, at the Bessemer General Hospital. Through his right thigh he had a bullet wound running from left to right and in his left side another "located right above the bone of the crest of the ilium." The physician found a bullet in Herbert's pelvis at a point lower than the entrance wound in the torso. Death came about two o'clock in the morning, April 20. Dr. Davidson was of the view that the wounds he examined caused death.

The scene of the shooting was the defendant's, Jewel Pearl Duff's, "place." This description seems to have embraced the dwelling house in which she lived with her husband, Nórthern Duff, and a nearby frame building used as a dance hall. Both buildings adjoined the Tuscaloosa-Birmingham Highway.

Sometime after 6:30, P.M., April 19, 1957, Will Alfred, also called "Old Man," came up to the dance hall. He had brought a package which he left on a step.

The package disappeared; Alfred and Herbert Riddle got into an argument as to whether or not Herbert had moved it, and they fell to fighting. Herbert's half brother, Nathaniel Riddle, pulled him off the Old Man. As so often happens in the course of human events, the office of peacemaker served but to divert Herbert's fight with the Old Man into a scuffle between Herbert and Nathaniel. Herbert's mother

(with the help of another half brother) broke up this second quarrel; she took Herbert home with her.

Herbert soon returned to the dance hall, and after he had been there about five minutes, he and the defendant got into an argument: "She said she would show anybody coming up there trying to take her place, so she went in the house and got the gun and came out and shot him." Meanwhile, Herbert had come onto the porch of the house and had taken a seat there beside Northern.

When the defendant came from the house, she had a pistol hidden in her bosom. Herbert, who was then in the yard, came toward her. She pulled the gun and shot three times.

The defense was that of justification because the taking of Herbert's life was the necessary consequence of Jewel Pearl protecting herself from an apparently murderous attack being made by him against her in which he used an ice pick.

The pertinent portion of her examination in chief reads:

"A. He said yes; he was going to have something to say. He was going to kill or get killed that night.

"Q. Then what happened? A. Then when he said that, this Rosie Davis—she had done got her eggs and we were standing there talking, and he first came off the porch and she said, 'I better leave. I believe there is going to be trouble around here.'

"Q. When did the pushing take place? A. I told him to quit, and he pushed me, and I started backing up, and I backed up a piece, and he come pushed me again, and I said, 'Go on, I don't want to hurt you.' And he said, 'You are a smart S. O. B.'

"Q. Which way did he push you? A. This way.

"Q. Did he push you toward your house? A. Toward my house porch.

"Q. Did he push you toward the house porch? A. Yes, sir.

"Q. Then what happened? A. When he pushed me twice, and first pushed me, I hadn't pushed him. I said, 'Go on, I don't want to hurt you.'

"Q. Then what happened? A. When he pushed me first, I didn't bother him, and he pushed me again, still cursing me, and I pushed him back.

"Q. Then what happened? A. Then he came up from the side with the ice pick in his hand, and I kept telling him, 'I don't want to hurt you.' And I run my hand in my bosom and got the pistol and shot up in the air.

"Q. You first shot up in the air? A. Yes, sir.

"Q. What happened then? A. It didn't stop him. He kept coming.

"Q. It didn't stop him. He just kept coming? A. Yes, sir.

"Q. Then what happened? A. I shot again. When I shot up in the air, it didn't make no difference. It looked like it made him that much worser, and he came drawed back the ice pick, and I shot, looked like, across his arm. It looked like it glanced it, and he didn't stop, and I made another shot and I had backed up as far as I could get, and that is when I shot the third time, and he fell."

◼ While the solicitor, in his opening statement to the jury, was outlining the State's expected proof, the mother of the deceased (who was sitting at the counsel's table) began "crying out loud"; whereupon, after objection by the defense, the judge admonished her to stop or else leave the court room. Defendant's counsel moved for a mistrial, claiming her conduct was "highly prejudicial * * * to the defendant's rights." This motion was overruled without error.

In brief the appellant contends that:

(1) The verdict was contrary to the evidence in that it came from bias and not from unprejudiced deliberation; (2) she was prejudiced by unfair argument, viz., "Yes, gentlemen of the jury, I am speaking about some of these places where the police officer got killed about three years ago."; (3) the solicitor improperly argued that the defendant (who pled self-defense) was under a duty to retreat; (4) she was hurt unfairly by argument and evidence implying that she had illegally sold or given beer and whiskey to Riddle, a minor; (5) it was error to admit medical testimony that the bullet found in the pelvis was lower in the body than the point of entry; (6) the court erred in admitting State's Exhibit 8, a photograph showing a pile of beer cans near the scene; (7) it was improper to ask (over objection) whether or not one of the witnesses saw the defendant with beer just before the shooting; (8) there was error in sustaining objection to the following question put by defense counsel: "I will ask you if she didn't come up there and tell Herbert to quit fighting and go on home with her?"; (9) it was error not to declare a mistrial on defendant's motion when the solicitor asked Robert Alfred if he tried to buy beer from the defendant shortly before the shooting; (10) it was error to deny the motion for a mistrial because of a reference to a prior court proceeding; and (11) it was error to admit evidence tending to show the good reputation of the deceased for peace and quietude even though the court excluded the entire testimony of the witness thereto.

We have considered contentions (1), (3), (5), and (7), and conclude they do not raise questions of error. Nor do we believe there is need to detail our reasons.

As to contention (2), we believe that the action of the trial judge sustaining the defense objection cured any error in the argument. Thus, in Barnes v. State, 34 Ala.App. 183, 38 So.2d 21, 23, where the prisoner was on trial for violating the prohibition law; error was cured by the court's exclusion of the argument, "He is a bootlegger." This characterization of Barnes was much more pertinent and damning than a slurring reference to the defendant's place of business.

Contention (4) arose out of:

"Mr. Zeanah: Why didn't they chastise him when he came there, instead of feeding him beer and whiskey all afternoon. You know that is where he got it. That is the only bootleg place up there.

"Mr. Jeff de Graffenried: We object to that statement.

"The Court: Overruled."

On cross-examination of the State's witness, Clyde Riddle, a brother of the deceased, it was brought out that at 6:30 of the evening in question the deceased was at the defendant's dance hall and had been drinking. On direct examination of Robert Alfred, the State, without objection, brought out that Jewel Pearl, her husband, one Jimmy Turner, and the deceased, Herbert Riddle, were at one time sitting together.

"I stood in the yard and talked to them awhile and they offered me a drink [of whiskey] and I refused * * * but after that, fifteen or twenty minutes, I did take a drink." On cross he testified that the fight between Herbert and the Old Man came about when Herbert said he would fetch the Old Man's package for a can of beer but that, after having gone in the dance hall and bought six cans of beer, the Old Man welshed on his promise to give Herbert a can. The defense brought out that Herbert was drinking whiskey.

In view of this testimony, we consider the statement objected to was within the range of permissible inference in arguing the evidence. A somewhat like situation is found in Alexander v. State, 37 Ala.App. 533, 71 So.2d 520, 525, where this court, per Harwood, J., said:

"In his argument in support of the contention that the court erred in over-

ruling his objections to certain remarks by the Solicitor in his argument to the jury, appellant's counsel states: 'It appears that the county solicitor attempted to prejudice the jury by arguing to them that the defendant was a bootlegger.'

"An examination of the record shows that the remarks were to the effect that the appellant had furnished whiskey on the occasion of the killing. Liberal rules are allowed counsel in drawing inferences from the evidence in their arguments to the jury. Mississippi Fire Ins. Co. v. Perdue, 217 Ala. 292, 116 So. 142, 62 A.L.R. 626. In view of the testimony of Cowen and Barkley to the effect that neither of them carried any whiskey to appellant's home, and that they did not see the deceased bring any, we think the Solicitor was within the bounds of allowable arguable inferences deducible from the evidence in these instances."

█ As to the photograph of the pile of beer cans, after reading the record which is replete with references by witnesses pointing out, on the various photographs, the location of various parts of the collective facts—the res gestae, we are unable to say that it had no probative force, Grissett v. State, 241 Ala. 343, 2 So.2d 399, and hence we cannot say the trial judge erred in admitting it.

█ Item numbered (8) above relates to a question put by defense counsel on cross-examining Clyde Riddle as to the mother of the deceased coming to take him away after the fight with his brother, Nathaniel. The evidence sought never developed any importance during the trial and its substance came out in other testimony. The trial judge has discretion with regard to the range of cross-examination so long as he complies with the mandate to allow thorough and sifting cross-examination (Code 1940, T. 7, § 443); see Sowell v. State, 30 Ala.App. 18, 199 So. 900.

█ The matter complained of as (9) in the above list arose on the examination in chief of Robert Alfred:

"Q. Did you drink any more?

"A. No, sir, not before Herbert got shot.

"Q. Did you try to buy any?

"A. Yes, sir.

"Mr. Edward de Graffenried: We object. We object to that.

"The Court: Sustained.

"Mr. Edward de Graffenried: We move to exclude it and ask for a mistrial.

"The Court: Overrule the motion for a mistrial. I exclude it.

"Mr. Edward de Graffenried: Except."

Since the witness' answer was given before the objection was made, there is nothing for us to review, Walker v. State, 265 Ala. 233, 90 So.2d 221.

█ The basis in (10) for a mistrial came during the examination of defense witness, Barbara Moore:

"By Mr. Jeff de Graffenried:

"Q. What is your age? How old are you? A. 20 years old.

"Q. 20 years old? A. Yes, sir.

"Q. Have you ever had to testify in court before? A. No, sir.

"Mr. Zeanah: We object.

\* \* \* \* \* \*

"Recross Examination

"By Mr. Zeanah:

"Q. You didn't testify in court against Jewel Pearl Duff when she had that case?

"Mr. Edward de Graffenried: I want to re-new my motion for a mis-

trial in this case. That is another question he asked. That is highly prejudicial.

"Mr. Zeanah: He brought it up.

"Mr. Edward de Graffenried: We didn't bring up another case.

"The Court: You asked her if she testified in any other case?

"Mr. Jeff de Graffenried: No, sir.

"Mr. Edward de Graffenried: He asked her if she ever testified in court before.

"The Court: Read the question. (The Court Reporter then read the last question propounded by Mr. Jeff de Graffenried on redirect examination, which was as follows: 'Have you ever had to testify in court before?')

"Mr. Edward de Graffenried: We have a motion. She said she did not, but we want to re-new our motion at this time for your Honor to declare a mistrial in this case. It is highly prejudicial. I don't like to use the work improper; I will say it is highly prejudicial and absolutely irregular for that question to be used where she is asked if she has testified in another case against this defendant to get the idea before the jury this defendant has had some other kind of case, whatever nature; it is highly prejudicial to bring that matter before the jury. We object to it. We ask Your Honor to instruct the jury they are not to consider it and we renew our motion to declare a mistrial.

"The Court: Overrule the motion for a mistrial. Gentlemen, you will only hear the evidence that goes to you and any evidence excluded will not go to you."

Strictly viewed, inasmuch as the question put by Mr. Zeanah failed to identify "that case" and there was no evidence to connect up this expression, there was left a dangling reference which, since the question was never answered, bore no prejudice.

The Attorney General treats, at some length, the question of admissibility of prosecution rebuttal testimony going to show the deceased's reputation for peace and quiet as the principal substantial question on this appeal, citing the rule as stated in Webster v. State, 207 Ala. 668, 93 So. 545. For a comprehensive discussion, see Annotation 34 A.L.R.2d 451.

We need not go into the application of the general rule or of its exception in cases of self-defense, because the trial judge excluded all the testimony of the witness in question.

Although this exclusion occurred on the morning following the testimony, a circumstance which might, if there were prejudicial matter, leave ineradicable harm (e. g., Poland v. State, 25 Ala.App. 213, 143 So. 209—testimony of paternity lingered overnight on jury's consciousness before exclusion), nevertheless here the action by the court in striking the evidence was a lagniappe to the defendant because the record here shows the witness had answered the question before there was objection. Also, the defense made no motion to exclude though by stipulation a motion to exclude was included in an overruled objection; we do not decide whether the delayed objection came within the stipulation. See Johnson v. State, 4 Ala.App. 62, 58 So. 554.

We have carefully considered the charges refused the defendant in the light of the oral charge and of the written requested charges given. We consider the jury was fully and fairly apprised of the law bearing on every material and necessary issue involved.

In addition to the matters urged upon us in brief, we have examined the entire record and consider the defendant here was accorded a fair trial without error.

Affirmed.