151 So.2d 752

Terry Dennis **MITCHELL**

v.

**STATE.**

5 Div. 601.

Court of Appeals of Alabama.

Jan. 23, 1962.

Rehearing Denied March 13, 1962.

Brown & McMillan, Opelika, for appellant.

MacDonald Gallion, Atty. Gen., John G. Bookout, Asst. Atty. Gen., and Herbert D. Schaefer, Montgomery, Legal Research Aide, for the State.

HARWOOD, Presiding Judge.

This appellant stands convicted of seduction, an offense denounced by Sec. 419, Tit. 14, Code of Alabama 1940, which reads as follows:

"Any man who, by means of temptation, deception, arts, flattery, or a promise of marriage, seduces any unmarried woman in this state, shall, on conviction, be imprisoned in the penitentiary for not less than one nor more than ten years; but no indictment or conviction shall be had under this section on the uncorroborated testimony of the woman upon whom the seduction is charged; and no conviction shall be had if on the trial it is proved that such woman was, at the time of alleged offense, unchaste."

In the trial below the prosecutrix, who was under the age of 21 years at the time of the alleged offense, testified that she first met the appellant in 1958. They saw each other frequently and in not too long a while, that is in July 1958, they became engaged, the appellant giving the prosecutrix an engagement ring. The prosecutrix and the appellant quarreled in May 1959, and their engagement was broken.

The prosecutrix next saw the appellant in August 1959, when he came by her home rather late at night. They sat on the porch and talked for some time and the appellant told her that he had broken his engagement to a girl in Birmingham, and that he wanted to marry the prosecutrix. According to the prosecutrix, the appellant had been drinking at the time of this visit.

The prosecutrix next saw the appellant when he came back to school early, to be with her, he said. This was on the weekend of 19 September 1959. She went out with him that night, and he was at her home the next day. Her mother went to the hospital that day, and the appellant came to the hospital after lunch. He was among several visitors in the mother's room. Late in the afternoon he drove one of the visitors, prosecutrix's grandmother, to her home and returned to the hospital in about 45 minutes. When he returned to her mother's room in the hospital the prosecutrix testified that the following conversation took place:

"A Well, no one else was in the room except Terry and Mother and I, and he went down and got us some Coca Colas and came back, and I told

him I had told Mother about us going back together again, and I told her that I had been promised a five dollar raise at the office and that—

"MR. BROWN: Now, I—excuse me, go ahead. I beg your pardon.

"Q (BY MR. YOUNG) Go ahead.

"A And I thought maybe we could get married now, and when Terry came back I told him I had told Mother, and he seemed pleased and he hugged Mother's neck.

Q What, if anything, did he say to your mother?

"A He didn't have very much to say; he was just happy, I think. I think both of us were.

\*   \*   \*   \*   \*   \*

"Q (BY MR. YOUNG) Well, just tell what happened, Miss Starling, go on and tell what happened there at the hospital please ma'am, from the time he got back from carrying your grandmother home.

"A Well, he went and got some Coca Colas for us, and nobody was there but Mother and Terry and I, and I told Mother that we had made up and that I thought that we could get married pretty soon, and that I had been promised a five dollar raise where I worked, and I thought that would help us. And Terry came back in, and I told him that I had told Mother about us, and he went over and hugged Mother's neck, and that's about all he said."

After about 30 minutes or an hour, the prosecutrix and the appellant left the hospital. They drove to a drive-in restaurant and had sandwiches. After they had finished eating, they drove out to a lake near Bleeker and parked. As to what occurred while they were parked on the lake, the prosecutrix testified as follows:

"A We talked about this girl that had broken us up and the reason for it, and we talked about his family and my family, and how we thought we could get along with each other, and he told me that he loved me and he kissed me several times as we were talking, and he said that it had been hard on him having to be away from me so long, and that he still loved me and wanted to marry me, and that he had been working that summer and he had some money now and we could go ahead and get married without his mother coming into it, and he told me that he wanted me and that he needed me and that—

"MR. YOUNG: Just a minute, please ma'am. All right go ahead.

"A And that he loved me, and that if I loved him enough I would prove it.

"Q That if you loved him enough you would prove it? Is that what he said to you?

"A Yes, sir.

"Q All right, go ahead, please ma'am.

"A And he kept talking to me, and I loved him and I thought that he loved me, and—I went with him."

The prosecutrix further testified that at the time that she had sexual relations with the appellant she was chaste and had not had previous sexual relations with the appellant, or with any other man.

On cross-examination the prosecutrix testified that she had filed a civil suit against the appellant claiming damages of $50,000.-00 in September 1960, and that she had employed Mr. James Noel Baker to prosecute said action, and that she had employed Mr. Baker as special prosecutor in the present proceeding. She further testified that she had instigated bastardy proceedings against this appellant which had been "thrown out" on technicalities.

Prosecutrix further testified that she had "parked" at various places around

Auburn with the appellant, that she had visited his apartment on numerous occasions, on which visits she would clean up his apartment and several times cooked meals for him. She and her mother would often do the appellant's laundry. Prosecutrix denied that on any of the above occasions she had engaged in sexual intercourse with the appellant.

Prosecutrix testified that she had driven with the appellant and another couple to a houseparty given by the appellant's fraternity at a motel on the Florida coast near Destin. She denied any improper conduct on this trip but stated that she had been in the appellant's room at the motel in that there was visiting back and forth and from room to room by the members of the houseparty. This houseparty had at least three chaperones.

The mother of the prosecutrix testified that during the time the appellant and the prosecutrix were engaged he was frequently in their home and had meals with the family from time to time. The appellant came in and out of their home as he pleased and they were always glad to see him.

As to the occasion of the appellant's visit to her hospital room on 20 September 1959, this witness testified as follows:

"Q (BY MR. YOUNG) Your daughter told him in your presence what?

"A That she had told me about their plans to get married.

"Q What, if anything, did Dennis Mitchell do or say then, please ma'am?

"A He—well, it was an exclamation of pleasure. He said, 'Good, I'm glad you did,' and—

"Q What, if anything, did he do?

"A He kissed me on the cheek just a little later than that. They talked for a few minutes, and he did kiss me on the cheek.

\*    \*    \*    \*    \*    \*

"Q Well, after he kissed you on the cheek, do you recall what the conversation was?

"A The conversation to me was that he would still try to be good to her.

"Q Try to be good to her? You say he said he would still try to be good to her?

"A Yes, sir. That was what he told us when he first asked if he could marry her."

The father of the prosecutrix testified that when he learned of his daughter's pregnancy, he contacted the appellant at his fraternity house in Auburn. The appellant accompanied him to his automobile and they rode around, the prosecutrix's mother also being in the car. During the ride, according to this witness, the following conversation ensued:

"A Well, his words were, after I told him—what I asked him about, which you won't let me tell—his words were, he said, 'I think you're asking too little of me.' And, he said, 'I'll go home tonight, or Saturday, over the weekend, and talk to my mother and tell her that me and Annice married in September, and I will be back here Monday morning and I'll meet you at the bus station and from there we'll go on down, we'll go on down and I'll do the right thing about it.' "

The next time this witness saw the appellant was at the preliminary trial pursuant to this prosecution.

In his own behalf the appellant testified that he was a student at Auburn University, in the sophmore class. He met the prosecutrix at a drive-in restaurant known as "Stoker's" and thereafter began seeing her frequently. He and the prosecutrix became engaged in July 1958.

The appellant testified that he first had sexual intercourse with the prosecutrix

about a month and a half after he first met her; that the prosecutrix visited him at his apartment two or three times a week, sometimes in the afternoon and sometimes at night, and that he had sexual intercourse with her on some of these visits. As to the houseparty in Florida, the appellant testified that he and the prosecutrix stayed in one bed in one room and another couple were in the second bed in the same room.

The appellant further testified that he and the prosecutrix had twice broken their engagement, the second time in the spring of 1959. He stated however, that he had seen the prosecutrix in the summer of 1959, and they had had sexual relations. Later in the summer, he called the prosecutrix over the telephone, and she had indicated during this conversation that she might be pregnant, but she further stated that she did not want to marry the appellant, being still bitter over their two prior breakups.

The appellant testified that on his visit to the mother of the prosecutrix in the hospital room on 20 September 1959, that there was no conversation about him and the prosecutrix getting married, that he did not kiss the mother and that he did not later that day or that night have sexual intercourse with the prosecutrix, and that he was not then engaged to the prosecutrix.

On cross-examination, appellant further reiterated his testimony to the effect that there was no discussion of marriage in the hospital room.

Also, he denied that he had ever told the father of the prosecutrix that he would marry her, and stated that the father "came after" him with a pistol. He stated that the father did not pull a pistol on him but that he did not have to in order to scare him.

The defense also presented three witnesses whose testimony tended to show that the prosecutrix had, at the houseparty in Destin, spent the night in bed with the appellant.

The defense also presented some thirteen witnesses who testified to the good reputation of the appellant.

In rebuttal, the State presented three witnesses who testified to the good reputation of the prosecutrix, and also her good reputation for chastity.

Also, in rebuttal, the father of the prosecutrix testified that he did not have a gun on him upon the occasion of his seeing the appellant after learning of his daughter's pregnancy, and that in fact he had not owned a gun in 20 years.

Further in rebuttal, prosecutrix in general denied the allegations of her misconduct on the houseparty, and specifically denied that she had ever told the appellant in their telephone conversation in the late summer of 1959, that she thought she was pregnant. The appellant called her and during her conversation with him her two sisters, her mother, father, and her grandmother were present in the room during the time she talked with the appellant.

Counsel argues strenuously that the court erred in overruling the motion to exclude the evidence made at the conclusion of the State's case in chief.

The crime of seduction is strictly statutory. Wilson v. State, 73 Ala. 527. All but about a dozen of our States have enacted statutes creating the criminal offense of seduction. In some of these statutes the promise to marry is the necessary inducement. The statutes of many States are broader, and the inducement may result from "temptation, deception, arts, flattery, or promise of marriage." Such is the Alabama statute.

The genesis and underlying idea of the various seduction statutes is most probably to be found in the earlier proceedings to enforce a marriage contract entertained in the Ecclesiastical Courts, with today's sanction of imprisonment taking the place of the sanctions employed by the Ecclesiastical Courts, such as the threat of excommunication and imprisonment until the contract was performed. See Humble,

Seduction as a Crime, 21 Col.L.Rev. 144; Burn's Ecclesiastical Law, 7th Ed., Vol. II, p. 456.

We think that under our statute the offense of seduction may be defined as inducing a chaste, unmarried woman, by means of temptation, deception, arts, flattery, or a promise of marriage, to engage in sexual intercourse.

The chasteness of woman is to be determined as of the time of the seduction, for a previously unchaste woman may reform, and if chaste at the time of the seduction, be within the terms of the statute. Tarver v. State, 17 Ala.App. 424, 85 So. 855.

The elements to be established by the State, to the required degree, in the prosecution were, (1) that the prosecutrix indulged in sexual intercourse with the appellant; (2) that she was seduced into such act by the appellant by means of temptation, deception, arts, flattery, or promise of marriage, and (3) that the prosecutrix was unmarried and chaste at the time of the alleged seduction. The statute further provides that no conviction can be had on the uncorroborated testimony of the woman seduced.

In Cunningham v. State, 73 Ala. 51, it was held that to meet the requirements of the statute as to corroboration "the corroboration shall be of some matter material to the guilt of the accused, that such matter must not be in its nature formal, indifferent or harmless, and that its effect shall be to convince the jury that the corroborated witness has sworn truly."

One year later, in Wilson v. State, 73 Ala. 527, Brickell, C. J., expressed the view, which he states prevailed in the larger number of jurisdictions, that the corroboratory evidence should extend to every material element of the offense of seduction. However, he observes, "A majority of the court do not, however, concur in this view. They adhere to the rule laid down in Cunningham v. State, at

present term, and it must be regarded as settled that the corroboratory evidence is sufficient, if it extends to a material fact, and satisfies the jury the woman is worthy of credit."

The rule of the Cunningham case, supra, as to the degree of corroboration, has been continuously followed since its pronouncement. See Munkers v. State, 87 Ala. 94, 6 So. 357; Cooper v. State, 90 Ala. 641, 8 So. 821; Allen v. State, 162 Ala. 74, 50 So. 279; Pannell v. State, 162 Ala. 81, 50 So. 281; Smith v. State, 13 Ala.App. 399, 69 So. 402; Herring v. State, 14 Ala.App. 93, 71 So. 974; Tarver v. State, 17 Ala.App. 424, 85 So. 855; Pace v. State, 32 Ala.App. 65, 21 So.2d 565.

As to the act of sexual intercourse, the evidence, in addition to the prosecutrix's testimony shows that the prosecutrix became pregnant and was delivered of a child. There was profert of the child.

While the mere fact of giving birth to a child, and the profert of the child has been held to be insufficient corroboration in the total absence of any other corroboratory evidence, Burke v. State, 18 Ala.App. 413, 92 So. 506, yet, as stated in Tarver v. State, supra: "One of the material ingredients of the crime is that sexual intercourse had been had with the prosecutrix. There was evidence that she had given birth to a child and profert of the child was made to the jury. This was corroborative evidence of cohabitation. The child and the defendant were both before the jury, and this court cannot say that the jury did not find the resemblance between the two so strong that they were convinced beyond all reasonable doubt that the defendant was the father of the child. Kelly v. State, 133 Ala. 195, 32 So. 56, 91 Am.St.Rep. 25." See also Shadix v. Brown, 216 Ala. 516, 113 So. 581.

Counsel argues strenuously the defense motion to exclude the evidence should have been granted since, counsel contends, there is no evidence tending to show any promise to marry other than the prosecutrix's statement as to what occurred at the lake.

■ We do not agree. The excerpts of the testimony of the prosecutrix, and of her mother as to the conversation in the mother's room at the hospital, we think entirely sufficient to show and corroborate a promise of marriage. While it is true this promise of marriage was recounted by the prosecutrix, the appellant was present. Under the testimony of the prosecutrix and her mother the plan to marry was acquiesced in by the appellant. Acquiescence is a consent inferred from silence; a tacit encouragement. Scott v. Jackson, 89 Cal. 258, 26 P. 898. It is tantamount to assent (Edwards v. Cooper, 168 Ind. 54, 79 N.E. 1047), and to an agreement (Matthews v. Murchison, C.C., 17 F. 760).

■ The testimony of the mother clearly tended to corroborate the prosecutrix's statement of the promise to marry. Johns v. State, 20 Ala.App. 299, 101 So. 772. This agreement was acquiesced in by the appellant both by his silence, and in his statements to the mother, and his conduct under the circumstances.

If the words and conduct of the man reasonably imply a promise of marriage, and are so understood by the girl, it is sufficient. No particular words of art are necessary for a proposal of marriage.

Chastity of the woman at the time of her seduction is an essential element of the offense of seduction. Our statute so provides.

■■ Until there is evidence to the contrary, the chastity of a woman must be presumed. Wilson v. State, 73 Ala. 527, at 535. And under our statute the requirement of chastity relates to the time of the offense. Hussey v. State, 86 Ala. 34, 5 So. 484; Suther v. State, 118 Ala. 88, 24 So. 43. A woman who may have surrendered her virtue may by reformation possess the virtue of chastity at the time of her seduction, and be within the protection of our statute which specifies chastity at the time of the alleged seduction. Suther v. State, supra.

■ While the appellant testified to repeated acts of intercourse with the prosecutrix over a considerable length of time, the prosecutrix denied all such previous acts, and testified she had never indulged in sexual intercourse with the appellant, or with any other man prior to surrendering herself to the appellant while parked at the lake. Three witnesses also testified to the good reputation of the prosecutrix, both as to her general reputation and her reputation for chastity. Clearly under this state of evidence, the chastity of the prosecutrix at the time of her alleged seduction was for the jury. Brown v. State, 21 Ala. App. 298, 108 So. 542.

Counsel for appellant argues strenuously that the solicitor's method of conducting the prosecution went beyond the limits of a vigorous prosecution and created an atmosphere of prejudice against this appellant to such an extent that he did not, and could not, receive a fair verdict at the hands of the jury.

After the prosecutrix had testified in detail as to what occurred while she and appellant were parked at the lake, the record shows that later during the re-direct examination of the prosecutrix the solicitor addressed the following questions to her:

"Q How long had you been there at the lake before you succumbed to his—?"

Upon the appellant's objection to this question, the court instructed the solicitor as follows:

"Let's leave out words like that."

The question was never answered.
During the re-direct examination of the prosecutrix, the record shows the following question propounded by the solicitor:

"Q Were you, the time you dated Schwartz, was it after he had come back to school and announced his intention to marry you?"

Upon the appellant interposing an objection to this question, the court stated:

"That's very leading and suggestive. Let's don't repeat the testimony with

every question. Let's make our questions in sequence of the testimony."

It is to be noted that the court in effect ruled with the appellant in connection with every one of the three questions. Furthermore, they merely paraphrased the testimony previously given by the prosecutrix as to the evidence sought. Although leading in character we cannot see that under the circumstances the appellant could have been injured in any of his substantial rights by the above instances.

Two other instances of which counsel for appellant complained and asserted as being prejudicial occurred during the cross-examination of the defense witness, Wayne Gibson. The record shows the following at the start of Gibson's cross-examination:

"Q (BY MR. YOUNG) Your name is G-i-p or G-i-b?

"A G-i-b."

Thereafter the witness was addressed as Mr. Gibson by the solicitor. This appears to us as nothing more than an effort by the solicitor to have a correct identification of the witness. Nor can we say that the solicitor's statement to this witness, "Come down, Brother Gibson" at the conclusion of his cross-examination could probably have injured this appellant in any substantial right, even in the light that Gibson had testified that he and appellant were fraternity brothers.

During the direct examination of the prosecutrix, the record shows that she was asked whether or not she became pregnant as the result of the act of sexual intercourse on the 20th of September, to which she replied, "Yes sir, I believe I did." The record then shows the following:

"Q You say you believe you did or you know you did?

"MR. BROWN: No, sir. Now, if it please the court—she answered the question.

"A I stayed with him the next weekend, too, and it had to be that time

or the next time; but I believe it was that time.

"MR. BROWN: Now, if it please the court, I knew it was coming. We ask that a mistrial be declared in this case, because there has been a very, very calculated effort to get in there this next weekend, if it please the court, and it was done purposely, for the purpose of prejudicing this jury, and I don't believe that the court can charge it out, and I ask that a mistrial be declared in this case as of right now on that objection and for that reason.

"THE COURT: Gentlemen, you will pay no attention whatsoever to that testimony of any other occasion. You will disregard and completely get our of your mind any other testimony of any other occurrence in this case. That has nothing whatsoever to do with this case, and I am instructing you as powerfully and as effectively as I can to disregard any other testimony other than this occasion down there at the lake. I overrule your motion for a mistrial.

"MR. BROWN: We reserve an exception."

It is settled by the doctrines of our decisions that where a specific date is fixed as being the one upon which the seduction occurred, evidence of subsequent acts of sexual intercourse are not admissible. Davis v. State, 18 Ala.App. 482, 93 So. 269; Herbert v. State, 201 Ala. 480, 78 So. 386; Pope v. State, 137 Ala. 56, 34 So. 840.

In view of the court's strong and positive instructions to the jury in excluding the above evidence, we are unwilling to cast a reversal upon the trial court upon his ruling denying the motion for a mistrial.

In view of the background of the evidence immediately above mentioned, counsel for appellant argues strongly that the solicitor's persistent efforts during the cross-examination of the appellant as to whether

or not he had asked the mother and father of the prosecutrix to let him take her out of the State the following weekend, as to whether he told them they were going to go to his grandfather's house in Atlanta and proceed from there to a football game in Tennessee, and as to whether the appellant knew where the Mountain Breeze Motel was in Etowah, Tennessee, was nothing more than an effort by the solicitor to get before the jury by inference, illegal evidence tending to show subsequent acts of sexual intercourse.

The court sustained the appellant's objections to this line of questioning, and upon defense counsel making a new motion for a mistrial on the grounds that the solicitor had persisted in asking a series of questions that were immaterial and irrelevant, and highly prejudicial to the cause of the appellant, the court denied the motion for a mistrial with the following instructions to the jury:

> "THE COURT: Gentlemen of the jury, I have sustained the defendant's objections to this line of questioning, there have been no answers, and you will not consider in the least the questions that are asked but merely the answers the court admits to you from the witnesses who are on the witness stand. You bear that in mind throughout your consideration and deliberation of this case. I overrule the motion for a new trial."

Ordinarily, the evidence which we presume was being sought by the solicitor, would have been inadmissible, and its admission as testimony would have been erroneous, and the solicitor's persistent effort along this line could not have been overlooked merely because the court sustained the appellant's objection to all such questions.

However, the record shows that during the direct examination of the appellant, he testified that when he came back to Auburn in September he went out to see the prosecutrix even before he had taken his clothes out of his car. From the other evidence we know that this was the 19th of September. The record then shows the appellant testified as follows:

> "Q Did you come back and see her? Did you have intercourse with her that day?
>
> "A No, sir.
>
> "Q Did you ever have intercourse with her in the month of September at any time?
>
> "A In the month of September?
>
> "Q September, yes, sir—19th, 20th, 30th or any other time?
>
> "A Yes, sir."

Thus the appellant in his direct examination testified that he did have sexual intercourse with the prosecutrix during the month of September, and subsequent to the 19th of September, which was the first time he had seen the prosecutrix in that month. He denied that he had had sexual intercourse with her on the 20th. Having thus injected such evidence into the trial of sexual intercourse in September which had to be subsequent to the 20th, the prosecution was then privileged to go into the details and facts of such subsequent acts of sexual intercourse. As stated in Colvin v. State, 37 Ala.App. 268, 70 So.2d 650:

> "The rule, crystallized by numerous decisions of the appellate courts of this State, is that where in examination of a witness a party brings out a part of a transaction or conversation, the other party may inquire fully into the transaction or bring out the whole conversation on further examination. Kimbrell v. State, 18 Ala.App. 641, 94 So. 241; Stephenson v. State, 27 Ala.App. 122, 166 So. 620; Campbell v. State, 32 Ala. App. 461, 27 So.2d 220; Graham v. State, 233 Ala. 387, 171 So. 895; Richardson v. State, 237 Ala. 11, 186 So. 580; Wesson v. State, 238 Ala. 399, 191 So. 249; Key v. State, 240 Ala. 1, 197 So. 363."

It is our conclusion that this record is free of error probably injurious to any substantial right of this appellant and the judgment below is due to be affirmed. It is so ordered.

Affirmed.