194 So.2d 570

**Jack JESSUP**

v.

**STATE.**

8 Div. 68.

Court of Appeals of Alabama.

Dec. 13, 1966.

Rehearing Denied Jan. 24, 1967.

Ralph E. Slate, Decatur, for appellant.

Richmond M. Flowers, Atty. Gen., and Walter S. Turner, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted on briefs November 3, 1966.

Jessup was indicted for the larceny of two electric heaters and a television. The Grand Jury averred the total value of these articles to be $170, thus making the accusation one of grand larceny. Code 1940, T. 14, § 331, as amended. Mr. R. J. Blankenship, operator of the All States Tourist Court in Decatur, was the owner.

February 10, 1966, a petty jury found Jessup guilty under a general verdict. Du Bois v. State, 50 Ala. 139 (hn. 4); Neely v. State, 35 Ala.App. 315, 48 So.2d 563 (hn. 4). Upon this finding the court adjudged Jessup guilty. March 17, after probation was denied, the court sentenced Jessup to eighteen months in the penitentiary.

## I.

Appellant's Statement of Facts gives the tendencies of the evidence (slightly paraphrased) thus:

Defendant and Leta Walden or Vest registered at the All State Motel. When they left they took two heaters and one television set. They were aided in this theft by one Bonnie Bowman. These articles were placed in the defendant's car, stored, and later the two heaters were then pawned by Bonnie Bowman, and an attempt made by Jessup to sell the television set to one Harry Carlton. The defendant learning that the officers were investigating the case, took flight to the State of North Carolina, where he was arrested and returned to the State of Alabama.

The defendant's evidence tended to show that he and Leta Walden together with Bonnie Bowman went to the motel operated by Mr. Blankenship. They were all drinking. He and Leta Walden went to a motel room to spend some time. He let Bonnie Bowman take his automobile and use it for some several hours that night. When Bonnie Bowman came back to the motel and knocked on the door to get the defendant and Leta Walden, Bonnie Bowman had one heater in her hand, and as they left the motel it was discovered by the defendant that Bonnie Bowman had placed another heater and a television set in the defendant's car. He became angry and frightened at this, and attempted to hide the television set with Harry Carlton, and to hide the two heaters in an apartment belonging to Bonnie Bowman, in order to allow Bonnie Bowman to straighten the matter out. He went to the State of North Carolina to avoid being arrested since he was innocent of the charges. Witnesses for the defendant, Leta Walden and Donnie Hames, bear out the defendant's story.

## II.

The occasion for the first claim of error arose during the State's cross-examination of one Haynes, a witness called by the defense:

"Q (BY MR. DOSS) Did you make arrangements for this man's bond when he was arrested and brought back here?

"A No, sir, I tried to.

"Q How many bonds have you tried to get for people that was arrested here in the last year?

"MR. POWELL: We object to that.

"THE COURT: I sustain it.

"Q (BY MR. DOSS) All right, I will ask you did you, or did you not try to get a Lemmond Boy and Horn Boy out on bond for burglarizing Lemmond Brother's Store and the Post Office here—

"MR. POWELL: I want to ask for a mistrial here on the consistency of the Solicitor asking questions here that has no basis, there is no evidence in this case that can be connected with this in anyway and I would like for it to go in the record that this is asked to prejudice the minds of the jury against the defendant and such prejudice couldn't be eradicated from the jury.

"THE COURT: I instruct you gentlemen of the jury to disregard any incidents that may have arisen from that question, that there was or is no evidence that he ever attempted to get anyone out of jail on bond other than this defendant and if there were, you couldn't hold it against him, it would be unfair to hold it against him, there might be many reasons why a man would want to get another man out on bond and I overrule the motion for a mistrial.

"MR. POWELL: We except.

"Q (BY MR. DOSS) How do you feel about law enforcement in general—

"MR. POWELL: We object.

"THE COURT: Sustain the objections."

Coupled with this foray, defendant in brief alludes to the State's cross-examination of Jessup himself (in part):

"Q Well then, after you were arrested and brought back from up there you made bond down here, didn't you?

"A Yes, sir.

"Q And you ran off to California again?

"MR. POWELL: We object, we object to the Solicitor saying that he ran off to California.

"THE COURT: I sustain that.

"MR. HUNDLEY: We want to go into the further evidence of his flight, we want to show that he went to California and tried to sneak back in here.

"MR. POWELL: We object to the Solicitor stating he tried to sneak back in here.

"THE COURT: No, after a man is under bond—I don't believe I will let you show that he went to California after he was arrested because he was under bond and it was presumed that the bond would bring him back anyway.

"MR. HUNDLEY: Well, it was a forfeiture is what I am getting at.

"MR. POWELL: We object to the Solicitor making such a statement as that in front of the jury and ask the Court to instruct the jury not to consider that.

"THE COURT: Well, it doesn't make any difference to you gentlemen whether his bond was forfeited or not so don't consider that."

We agree with the trial judge and Jessup's counsel that these questions sought to inject immaterial and prejudicial matter into the consideration of the case by the jury.

The second incident we note shows that the trial judge ruled with defense counsel on every point.

Aside from the aspect of the two episodes being viewed cumulatively, we first look to the overruling of the defense motion for mistrial.

In McGee v. State, 36 Ala.App. 479, 59 So.2d 618, we find:

"* * * The witness again replied 'He raped me,' and again the statement was excluded, and the jury instructed not to consider it. Thereafter the court overruled appellant's renewed motion for a mistrial.

"We do not think reversal should result from these instances. The answers volunteered by the witness were not called for by the questions asked, which were proper in form. *The court took prompt action to eradicate their influence.* * * *" (Italics added.)

No precise formula for measuring eradicability appears other than in instances of disparagement because of race or religion.

In Crook v. State, 42 Ala.App. 270, 160 So. 2d 884, we discussed the court's instructing the jury as to withdrawn remark, "Don't consider it." There we wrote:

"Eradication or removal of prejudicial matter ordinarily involves (a) what is before the court, and (b) if prejudicial the effect of any corrective action.

"The requisites for such action are that it be sure, swift and certain: prompt, clear and forceful. Johnson v. State, 242 Ala. 278, 5 So.2d 632; Myhand v. State, 259 Ala. 415, 66 So.2d 544.

"We lay aside a consideration of the three instances of objected to argument as single items.

### C.

"Cumulation to Prejudice

"The leading authority for this principle (three strikes and out, see Lawson, J., dissenting in Myhand, supra) is the seldom applied case of Blue v. State, 246

Ala. 73, 19 So.2d 11. Under the reasoning there, argumentativeness in questioning may be weighed along with other conduct, e. g., verbal statements summing up for the State. Cf. Humphries v. State, 38 Ala.App. 388, 84 So.2d 669.

"Thus, in Humphries v. State, `supra, though the trial judge in virtually every instance sustained objection and, at the more acutely disparaging efforts, charged the jurors to direct their minds away from the sway of passion and prejudice into the path of reason and relevance. Yet this was not enough to head off reversal."

An argumentative question unanswered, if not based on evidence otherwise admitted, resolves into counsel's argument. The same standard of eradicability as applied in Lee v. State, 265 Ala. 623, 93 So.2d 757, is applied in cases such as Wilson v. State, 39 Ala.App. 77, 94 So.2d 408, Duff v. State, 40 Ala.App. 80, 111 So.2d 621.

In Lee, supra, we find:

"There is no question but that the argument of the solicitor to the effect that a man sentenced to the penitentiary will at some time become eligible for pardon or parole was improper. But as before indicated, when that argument was made counsel for the defendant interposed no objection and the provisions of the automatic appeal statute, supra, have no application. Jackson v. State, 260 Ala. 641, 71 So.2d 825; Washington v. State, 259 Ala. 104, 65 So.2d 704.

"The remarks of the solicitor were of the class of improper argument which may be remedied or their evil effect eradicated by instructions of the court. Oliver v. State, 232 Ala. 5, 166 So. 615; Pilley v. State, 247 Ala. 523, 25 So.2d 57; Wise v. State, 251 Ala. 660, 38 So.2d 553.

"As shown above, the trial court strongly instructed the jury that they should decide the case on the evidence presented to them and should not be concerned with

any future action which might be taken by a parole board. * * *"

The opinion mentions also, " * * * nor was an effort made to have the case taken from the jury." Then the court under a totality view affirmed the conviction.

Even the Solicitor's reference to the defendant as a Negro in closing argument was held to be eradicated by the trial judge's promptly charging the jury to disregard it. Amerson, ante p. 148, 182 So.2d 901. There too, as happened here, the defense had moved for a declaration of mistrial.

Cases of conviction with death sentence are reviewed liberally. We gather from Jackson v. State, 260 Ala. 641, 71 So.2d 825, that even under the Automatic Appeal double standard (Michie's 1958 Code, T. 15, §§ 382(1)–382(13)), a motion for a new trial is needful to protect a record. The motion for new trial is there viewed as the final chance to have a ruling from the trial judge.

This doctrine in death cases of "ineradicable prejudice" seems to apply only "when remarks of counsel are of such character that neither rebuke nor retraction can entirely destroy their sinister influence."

 We consider that comparison with the foregoing standards upholds the trial judge's refusal here to declare a mistrial. Peyton v. State, 40 Ala.App. 556, 120 So.2d 415 (hn. 16); Mitchell v. State, 42 Ala.App. 41, 151 So.2d 752 (hn. 11).

### III.

The second claim of error arose from allowing, over objection, the testimony of the State's rebutting witness, Jimmie Louise Hudson. This girl had driven defendant from Decatur to North Carolina.

 Predicates for impeachment were laid by the prosecution in cross examining Jessup. Miss Hudson's testimony contradicted Jessup.

Objection was raised that her testimony would not be rebuttal. Code 1940, T. 7, § 252, provides:

"§ 252. The court may, at its discretion, at any time before the conclusion of the argument, when it appears to be necessary to the due administration of justice, allow a party to supply an omission in the testimony on such terms and under such limitations as the court may prescribe."

■ This statute applies to criminal trials. Pugh v. State, 239 Ala. 329, 194 So. 810; Nichols v. State, 276 Ala. 209, 160 So. 2d 619.

## IV.

This cause was tried before June 13, 1966. Hence, Mathis v. State, Ala., 189 So.2d 564, controls our consideration of confessions.

Appellant claims that through the guise of rebuttal, Miss Hudson was allowed to testify as to Jessup's confessing to her on the journey to North Carolina. No preliminary predicate to show voluntariness was laid.

We quote from part of her examination:

"Q (BY MR. HUNDLEY) Did he say anything to you—

"MR. POWELL: Now, we object to any question being asked that's not rebuttal testimony.

"THE COURT: Let's let her answer it, let him finish the question first?

"Q (BY MR. HUNDLEY) Did he say anything to you on that trip about why he was leaving Decatur or what he had done in Decatur?

"MR. POWELL: We object to whether anything had been said or not. If he is going back in and open his case, we are going to have to open ours and start ours again, the basis for our objection is that it's for rebuttal only and—

"THE COURT: It is rebuttal but it's discretionary and I will permit him to ask the question, it's a discretionary matter to reopen and I will let you put on any evidence in rebuttal to it that you want to.

"You can answer the question now.

"A What was the question?

"Q (BY MR. HUNDLEY) Did he say anything about why he was leaving Decatur, whether he had to leave Decatur, anything about being in trouble or anything?

"MR. POWELL: I object to the leading question.

"THE COURT: Overrule.

"MR. POWELL: We except.

"A Well, he said that Bonnie Lynch [Bowman] and them had stolen heaters and they were trying to blame it on him.

"Q And that was the reason he was leaving?

"A That's what he told me.

\* \* \* \* \* \*

*"RE-CROSS EXAMINATION*

"Q (BY MR. POWELL) You're telling this jury as a witness for the State of Alabama that on that occasion, during the time this happened that he told you that Bonnie Lynch and them stole some heaters and televisions and was trying to lay it on him, trying to lay the blame off on him?

"A Yes, sir."

■ We consider that this language particularly "and them" in nowise is a clear admission of committing the offense. Its import was for the jury.

We note that defense counsel did not invoke the voir dire rule of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. Rather, his cross-examination is a reinforcement of the exculpatory context. We dis-

**522**

tinguish the facts here from those in Brown v. State, 42 Ala.App. 125, 154 So.2d 758.

We have carefully considered the entire record and consider the judgment below is due to be

Affirmed.