651 So.2d 599 (1993)
Derrick Anthony DeBRUCE
v.
STATE.
CR 91-881.
Court of Criminal Appeals of Alabama.
March 5, 1993.
Rehearing Denied May 7, 1993.
*602 Erskine R. Mathis, Birmingham, for appellant.
James H. Evans, Atty. Gen., and Melissa Math and Beth Poe, Asst. Attys. Gen., for appellee.
BOWEN, Presiding Judge.
On August 16, 1991, six men[1] participated in a robbery at the Auto Zone store in Talladega, Alabama. During the course of that robbery Doug Battle was shot and killed. Derrick Anthony DeBruce, the appellant, was indicted and convicted for the capital offense of murder during a robbery, as defined in Ala.Code 1975, § 13A-5-40(a)(2). The trial court accepted the recommendation of the jury and sentenced the appellant to death. This direct appeal is from that conviction.

I.
The appellant argues that the district attorney impermissibly shifted the burden of proof on the element of intent through his misleading comments to the jury.
The prosecutor's comments and the objections of defense counsel, where made, are as follows. During the course of his guilt phase opening remarks, the district attorney commented:
"[District Attorney] Of course, we expect the evidence to be when you point a gun at somebody and aim at somebody and pull *603 the trigger, those are intentional acts. The pointing of the gun, the pulling of the trigger, those are all intentional acts. Of course, the act which follows then of course would be intentional.
"MR. DELGROSSO [defense counsel]: We object to that if it please the Court.
"THE COURT: Overruled.
". . . .
"[District Attorney] ... I'll submit this to you, that in law and in common sense, if you take a gun with a man laying on the floor and you point it at him and you pull the hammer back and you pull the trigger and you shoot a bullet, that is an intentional act of killing." R. 327-28.
In his guilt phase closing argument to the jury, the assistant district attorney argued:
"And that is for you to decide. That when you take guns in there and you are going to rob the store, some of the natural consequences that can flow from that type of activity, that someone could end up getting killed.
". . . .
"So all those things, in a chain related back to what someone intended. In other words, did you intend the consequences of those acts? Those acts. That being, having the loaded gun, pointing the loaded gun at somebody, and pulling the trigger." R. 985-86.
During his guilt phase closing argument, the district attorney stated:
"The accomplice is criminally responsible for his acts that are [the] direct natural result of a conspiracy, or a foreseeable consequences of the conspiracy. In other words, what is the foreseeable consequences of six people, armed with weapons, going into a store to rob it, and look at the people in there. There are consequences that can arise from that, somebody could get killed. And that is exactly what happened in this case. Somebody got killed." R. 999.
"But that man over there shot Doug Battle. And when you aim a gun, and you point it, and you pull that trigger, that is just as intentional an act as you can get. You cannot get more intentional than that." R. 1041.
Although the appellant complains of these six instances of allegedly improper argument, objection was raised at trial to only one instance. That objection was a general objection and no specific grounds were stated.
"`While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985)] (emphasis in original). `This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). `Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837, 843 (Ala.Cr.App.1986), reversed on other grounds, 516 So.2d 846 (Ala.1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr. App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). See also Ex parte McWilliams, 640 So.2d 1015, 1019 (Ala.1993). These principles are applicable throughout this opinion.
We do not consider the prosecutors' remarks to constitute "plain error."
The appellant's argument that the above comments created a "mandatory presumption" that the appellant had the intent to kill is based on an erroneous factual contention. Contrary to the appellant's argument, there was evidence supporting the rational and reasonable inference that the appellant intentionally shot the victim. At trial, the State *604 presented evidence that six men participated in the robbery. Five of those men actually entered the Auto Zone store. Each of those five was armed with a firearm. Lujuan McCants, one of the robbers, testified to the effect that the appellant went inside the store armed with a .380 handgun, that McCants heard a gun shot and saw the appellant running out of the store, that the appellant was the last one out of the store, and that once the appellant was in the get-away car, the appellant twice admitted to shooting Battle because "he was trying to protect [McCants]." R. 916, 922-23. According to McCants, Battle refused to get on the floor as directed and called the appellant a "young punk." R. 921. McCants testified that the appellant "took care of the man and hit him down to the ground." R. 920. Other witnesses positively identified the appellant as one of the robbers.
Within the context in which the arguments were made, the above-quoted comments by the prosecutor did not constitute impermissible error.
"This court, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. See Duncan v. Stynchcombe, 704 F.2d 1213, 1216 (11th Cir.1983). Such prosecutorial misconduct, if `so pronounced and persistent that it permeates the entire atmosphere of the trial,' requires reversal. United States v. Alanis, 611 F.2d 123, 126 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. See Houston v. Estelle, 569 F.2d 372, 380 (5th Cir.1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. See [In re] Winship, 397 U.S. [358,] at 364, 90 S.Ct. [1068,] at 1072[, 25 L.Ed.2d 368 (1970)]. We reaffirm the former Fifth Circuit's position that `the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law.' Houston, 569 F.2d at 380."
United States v. Simon, 964 F.2d 1082, 1086 (11th Cir.1992).
Here, the prosecutors did not argue or imply that the appellant had any obligation to produce evidence. The evidence supports the prosecutor's theory that the appellant intentionally shot the victim. The reasonableness of this hypothesis is best demonstrated by the fact that in his closing argument to the jury, defense counsel argued that "[w]hoever killed him stood up behind him, or over him, while he was laying on the ground and put a bullet in his back. That's why that bullet didn't fall out of his chest. The floor kept it from falling out." R. 1026. The prosecutors's comments simply do not create any impermissible "mandatory presumption" or shift any burden of proof.

II.
The record does not support the appellant's contention that he was denied a fair trial as a result of numerous acts of alleged misconduct by the prosecutor. The prosecutor's actions have been exaggerated and distorted. Without question, the district attorney was vigorous and aggressive in his prosecution of the appellant. However, it is the opinion of this Court, based on our review of the record, that the hard blows struck by this district attorney were not foul.

A.
The appellant filed a written motion to invoke "the rule" prior to the voir dire of the jury venire. CR. 59-65, R. 54. It was within the sound discretion of the trial court to sustain the prosecutor's objection and refuse to allow the appellant's mother and father, who might testify at the sentence phase of the trial, to be excused from "the rule" and to remain in the courtroom during the guilt phase of the trial. Rule 9.3(a), A.R.Crim.P. See also Henderson v. State, 583 So.2d 276, *605 291 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). The trial judge made it clear that "[i]f you [defense counsel] tell me one of them is not going to be a witness at any time in any part of the proceedings that might come forth, then I'll exclude them." R. 292. "[T]he decision to exclude or not to exclude witnesses from the courtroom remains a matter of discretion for the trial court." Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).

B.
The appellant argues that the prosecutor improperly introduced into evidence "mug shot" photographs of the appellant and his five codefendants. Each photograph consisted of a frontal view of the head and shoulder area of the depicted individual with "height" lines, either numbered or unnumbered, in the background. There were no juxtaposed frontal and profile views of any person. No date, identification number, police markings, or other information appeared on any photograph.
When the prosecutor stated that "there is nothing that you can look at the photograph and make a determination for a person viewing it that it is from [the] Talladega Police Department," the trial court responded, "I think that is a correct statement." R. 403. In addition, the trial court found that the photographs were "not suggestive." R. 419.
"The presence of lines in a photograph do not mean that the person in the photograph is a criminal, has a criminal record, or has committed a crime involving moral turpitude." Lockett v. State, 518 So.2d 877, 880 (Ala.Cr.App.1987). "In Williamson v. State, 384 So.2d 1224, 1231 (Ala.Cr.App.1980), this Court found that a photograph depicting a frontal view of the subject with a height chart in the background was not objectionable as a `mug shot.'" Parker v. State, 587 So.2d 1072, 1093 (Ala.Cr.App.1991) (death case).
To the extent that the photographs could be considered "mug shots,"[2] those photographs were properly admitted into evidence.
"Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history.... However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error.
"... The three requirements [that should be met before a mug shot is admissible are] set out in [United States v.] Harrington [490 F.2d 487 (2d Cir.1973):]
"`1. The Government must have a demonstrable need to introduce the photographs; and
"`2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
"`3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.'
"Harrington, 490 F.2d at 494. We conclude that these three inquiries are appropriate criteria to consider when determining the admissibility of a mug shot; however, the failure to meet one or more of these criteria would not necessarily result in reversible error. We shall still apply Rule 45, Ala.R.App.P., when deciding whether to reverse or set aside a judgment for error."
Ex parte Long, 600 So.2d 982, 989 (Ala.1992).
Here, the photographs were employed to connect the appellant with the codefendants. The photographs themselves do not imply the existence of any criminal record and the prosecutor did not draw any attention to the source of the photographs when referring to the photographs during the trial.
Contrary to the appellant's argument made in connection with this issue, the testimony *606 is that none of the five witnesses[3] who viewed the photographic lineups made any identification of the photographs after having seen the codefendants on television. Only Larry McCardle indicated that he had made such an identification after having seen the appellant's photograph in the newspaper. However, that witness testified that "[t]here was no question in [his] mind whatsoever" about his identification of the appellant. R. 553. See Part XI of this opinion.

C.
The district attorney vigorously cross-examined the appellant outside the presence of the jury at the hearing on the appellant's motion to suppress the statement made to Talladega Police Detective Tom Bowerman. The district attorney aggressively cross-examined the appellant on the circumstances surrounding the appellant's arrest, the voluntariness of his statement, and the waiver of his constitutional rights. We reject the appellant's argument that the district attorney "ask[ed] improper questions and ... badger[ed] Derrick DeBruce in an attempt to chill Mr. DeBruce's desire to testify on his own behalf." Appellant's brief at 13.
"In Alabama, a party is entitled to a thorough and sifting cross-examination of the witnesses against him.... The cross-examination is not limited to matters addressed in the witness's direct testimony, but may concern all matters relevant and material to every issue of the action.... Of course, the trial court is vested with considerable control over the scope of cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party.... The trial court may not, however, limit cross-examination as to a relevant and material matter until the examining party has substantially exercised his right to question the witness thereon."
Perry v. Brakefield, 534 So.2d 602, 607-08 (Ala.1988) (citations to authority omitted). "`When the defendant in a criminal case avails himself of the statutory privilege of testifying as a witness ..., he subjects himself to the test of cross-examination as to any matter connected with the transaction, or pertinent to the issue...." Douglass v. State, 257 Ala. 269, 274, 58 So.2d 608, 613 (1952). At a hearing to determine the voluntariness of a statement or confession, "the defendant may take the stand and testify for the limited purpose of making a record of his version of the facts and circumstances under which the confession was obtained." Wallace v. State, 290 Ala. 201, 204, 275 So.2d 634, 636 (1973). "When the defendant takes the stand as a witness, [he or] she is subject to cross-examination, as any other witness." Bettis v. State, 160 Ala. 3, 5, 49 So. 781 (1909). We find that the prosecutor's questions did not exceed the permissible broad scope of cross-examination of the appellant on the issue of the voluntariness of his statement to Detective Bowerman.

D.
Quite obviously the district attorney was guilty of leading certain witnesses. Most of this occurred in establishing proper chains of custody and in laying predicates for the admission of other evidence. "Whether to allow or disallow leading questions is discretionary with the trial court and [only] for a flagrant violation will there be reversible error." Jones v. State, 292 Ala. 126, 128, 290 So.2d 165, 166 (1974) ("[t]here was no error in overruling objections to leading questions propounded by the State to its witness in laying the predicate to establish the voluntariness of the confession").
The record does not support a finding that the prosecutor's manner of questioning witnesses in this case prejudiced this appellant. We find no abuse of discretion by the trial court in its ruling on this matter.[4] We reject *607 the appellant's contention that "[t]his continual leading placed Mr. Rumsey [the district attorney] in the role of the State's star witness." Appellant's brief at 14.

E.
We also reject the appellant's contention that the district attorney improperly appealed to the emotions of the members of the jury. The appellant complains because, during the guilt phase of the trial, the district attorney called the victim's sister, Carolyn Denise Battle, as a witness and had her identify a photograph as being a photograph of the victim. There was no objection to this identification at the time it occurred. R. 941.
The only indication that Ms. Battle became upset or displayed any emotion is found in the guilt phase closing argument, when the assistant district attorney stated:
"I apologize to you for being required to put someone on to identify Doug Battle. Don't hold that against anybody. The lady became upset [about] that. I understand that. But please don't hold it against us that we put someone on, because it is our burden to identify Doug Battle by someone that knew him during his lifetime. And it is uncontroverted naturally that the person taken to the autopsy, who Dr. Embry told you, died as a result of a gunshot wound, is in fact Doug Battle. And that was the person who proved that particular matter." R. 989.
The photograph identified by Ms. Battle depicted the head and shoulders of her deceased brother, apparently lying on an autopsy table. The photograph did not depict any wounds, was not emotion-stirring in and of itself, and did not distort the facts or mislead the jury in any way.
"Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered....
". . . .
"... Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury."
Ex parte Bankhead, 585 So.2d 112, 118 (Ala. 1991).
"[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence § 207.01(2) (4th ed. 1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr. App.1986), cert. denied, 506 So.2d 372 (Ala. 1987).

F.
The appellant also argues that the district attorney improperly appealed to the emotions of the members of the jury when, during the sentence phase of the trial, he responded to a statement that the appellant was permitted to make to the jury as part of the closing argument. In connection with this event, the appellant also argues that the district attorney commented on the appellant's decision not to testify in his own defense.
The appellant did not testify at either the guilt or the sentence phase of his trial. After all the evidence had been presented at the sentence phase of the trial, the trial court, at the request of defense counsel, announced that it would permit the appellant to make a statement "in closing argument.... It will still be the same thing as an argument to the jury, whether he make[s] it in closing, opening or middle.... So really it is an argument to the jury." R. 1146. In instructing the jury immediately before those closing arguments, the trial court stated:
"I want to tell you that it is my understanding that the defendant may decide to make a statement to you at closing argument. He has a right to do this just like his lawyers do in the opening and closing. However, I do want to instruct you that the statement of the defendant, like his *608 lawyers', is not evidence in this case. You are not to consider it as evidence because the evidence comes to you from the witness stand, this place right here.
"Satisfied with these instructions?
"MR. MATHIS [defense counsel]: Yes, sir." R. 1153-54.
In his statement to the jury during closing argument, the appellant said:
"MR. DeBRUCE: I have a son who is one year old and my mother. I love my mother. I love my son. I just want you to please don't kill me. I would like to also say to the mother over here, I'm sorry and
". . . .
"As I was saying, ladies and gentlemen of the jury, that I was sorry and that I beg forgiveness and also for y'all to forgive me and think about letting me live. Let me live. I'm still a young man. I won't be able to be free any more, but I want to be able to see my child and see him grow up. I really do, ladies and gentlemen, want to live. Please, please don't kill me. Let me live. Thank you." R. 1169-70.
Defense counsel then presented his closing argument.
In his closing rebuttal argument, the district attorney responded:
"He gets up here and he talks to you, but the only evidence that you could consider is what comes from here under oath. The only evidence that you can consider is what comes under oath." R. 1176.
Defense counsel made no objection to this argument.
The district attorney's statement was not a comment on the appellant's exercise of his right against self-incrimination. The district attorney merely commented on the appellant's statement to the jury and repeated the trial court's previous instructions, to which defense counsel had indicated his satisfaction. The trial court made it clear that any comment made by the appellant in closing argument would be treated as merely a part of the argument. When the appellant assumed the role of his own defense counsel in making a closing argument to the jury, his comments were subject to the same criticism available as if the comments had been made by defense counsel. "It is the right of counsel under the guidance of the court, to discuss the rules of law applicable to the different phases of the testimony." Davis v. State, 213 Ala. 541, 543, 105 So. 677, 678 (1925). "Statements of counsel to the court are not evidence." Evans v. State, 341 So.2d 749, 750 (Ala.Cr.App.1976), cert. denied, 341 So.2d 750 (Ala.1977).
Unquestionably, the testimony of the victim's sister (discussed in Part II-E above), and the appellant's plea for his life during closing argument were emotional moments during the trial. However, neither event was inflammatory. Furthermore, the appellant was solely responsible for anything in his comments that elicited or evoked any emotional response. "Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State, 527 So.2d 154, 156 (Ala.1988).
In McNair v. State, 653 So.2d 320 (Ala.Cr. App.1992), this Court held:
"`[A]s a general rule, a demonstration by, or the misconduct of, a bystander or spectator during a criminal trialincluding even a disturbance having a tendency to influence or disturb the juryis not deemed to be sufficient reason for the granting of a new trial unless it appears that the rights of the accused were prejudiced thereby, and, generally, in the absence of a showing to the contrary, it will be assumed that the jury was not prejudiced; similarly, manifestations of grief by spectators related to the victim of a crime, as a general matter, will not alone furnish good ground for a new trial, a showing being required that the case of the accused was prejudiced by such conduct.'
"Annot., 31 A.L.R.4th 229, 234-35 (1984). This same general rule also applies to emotional manifestations made while testifying. 31 A.L.R.4th at 235-36. See Hall v. State, 500 So.2d 1282, 1290-91 (Ala.Cr.App.1986) (rape victim cried during her testimony); Smith v. State, 37 Ala.App. 116, 118, 64 *609 So.2d 620, 621, cert. denied, 258 Ala. 647, 64 So.2d 622 (1953) (assault victim `cried aloud' during testimony); James v. State, 44 Ala.App. 593, 595, 217 So.2d 545, 547 (1969) (assault with intent to rape victim cried twice during testimony); Lee v. State, 265 Ala. 623, 627, 93 So.2d 757, 761 (1957) (wife of deceased murder victim `sobbing' while testifying); Duff v. State, 40 Ala.App. 80, 83, 111 So.2d 621, 624 (1958), cert. denied, 269 Ala. 696, 111 So.2d 627 (1959) (mother of deceased murder victim `crying out loud' during prosecutor's opening statement). This rule applies in capital cases. See Henderson v. State, 583 So.2d 276, 287 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
"The emotional manifestations present rise nowhere near the level presented in Collum v. State, 21 Ala.App. 220, 221, 107 So. 35, 35-36 (1926) (new trial required where in a prosecution for seduction, the prosecutrix fainted in the witness chair, and mother came to her aid weeping and crying, `Nobody knows how much we have suffered over this trouble. Lord have mercy on us.') and White v. State, 25 Ala. App. 323, 324, 146 So. 85 (1933) (new trial required where widow of murder victim contradicted defense counsel during his closing argument).
"Here, as in Smith, 37 Ala.App. at 118, 64 So.2d at 621: `The trial judge witnessed the incident[s]. To him must of necessity be committed a wide discretion in determining whether or not the occurrence[s] affected the rights of the accused to a fair, impartial trial.' We find no merit to the appellant's argument that the prosecution should have been required to call witnesses who were not members of the victim's family."
See also Uldric v. State, 43 Ala.App. 477, 480, 192 So.2d 736, 739, cert. denied, 280 Ala. 718, 192 So.2d 739 (1966) (mistrial properly denied where judge promptly instructed and admonished jury to disregard outburst by widow of deceased).

G.
The district attorney's arguments during the guilt phase of the trial did not deny the appellant a fair trial.
1. The prosecutor's argument that the appellant intentionally shot Mr. Battle because the appellant aimed the pistol, cocked the hammer, and pulled the trigger of the pistol was a reasonable inference from the evidence, as this Court has already determined. See Part I. The comments of which the appellant complains were made in the district attorney's opening remarks and were preceded by the statement, "Of course, we expect the evidence to be...." R. 327.
2. The prosecutor's comment that the pistol found in the appellant's car was unloaded and his theory that the unloaded pistol was an indication of a conspiracy (R. 1032-33) were within the realm of legitimate argument. Those comments were also a reply to defense counsel's "gun swapping" argument.[5] R. 1014, 1019-20. A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. See Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984).
"[T]he rule is that counsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury." Espey v. State, 270 Ala. 669, 674, 120 So.2d 904, 907 (1960). "Counsel is allowed, within limits, to draw their own conclusions and to express their arguments in their own way, provided, of course, they do not travel out of the record or make use of unfair means to create prejudice in the minds of the jury." Garrett v. State, 268 Ala. 299, 303, 105 So.2d 541, 544 (1958).

*610 "In Alabama, liberal rules are allowed counsel in drawing inferences from the evidence in their arguments to the jury.... Counsel has a right to argue any reasonable inference from the evidence or lack of evidence, ... and to draw conclusions from the evidence based on their own reasoning....
". . . .
"Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though far-fetched.... So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled."
Roberts v. State, 346 So.2d 473, 476-77 (Ala. Cr.App.), cert. denied, 346 So.2d 478 (Ala. 1977). "Counsel in making argument to the jury have a right to state their conception of what the evidence is." Hope v. State, 21 Ala.App. 491, 492, 109 So. 521, 522 (1926). "Certainly, the State has as much right as the defendant to argue to the jury every matter of legitimate inference from the evidence, and ... `the evidence may be examined, collated, sifted, and treated in [the solicitor's] own way.'" White v. State, 41 Ala. App. 54, 58, 123 So.2d 179, 181-82, cert. denied, 271 Ala. 702, 123 So.2d 186 (1960). "Whether an inference is reasonable is generally within the sound discretion of the trial judge." Hayes v. State, 588 So.2d 502, 505-06 (Ala.Cr.App.1991). See also Kuenzel, 577 So.2d at 493-94.

H.
The appellant argues that the district attorney improperly bolstered the testimony of the State's main witness, the accomplice Lujuan McCants.
In his closing argument to the jury, the district attorney stated:
"Now, Lujuan McCants. You know, it always amazes me, that what the State did relative to Lujuan McCants. I made that decision. That's my decision. If you don't like it.
"MR. MATHIS [defense counsel]: We object to that. That's improper.
"THE COURT: Overruled.
"MR. RUMSEY [district attorney]: (Continuing) If you don't like that decision, then you can hold it against the State of Alabama, because I made that decision. But, you have heard all the evidence in this case. And I'll submit to you, you observed Lujuan McCants on that witness stand. You saw him testify. And you saw his demeanor, and you know everything about him. He was cross-examined by the lawyers.
"Now, either you are going to believe Lujuan McCants or you are not going to believe Lujuan McCants. But I'll submit to you, Lujuan McCants is telling you the truth....
". . . .
"... And I'll submit to you, it [how the robbery/murder occurred] is just like Lujuan McCants said.
". . . .
"And I'll submit to you, that is the evidence. And then you weigh that. Because I told you at the first of the case that there would be conflicting testimony. There is conflicting testimony in every case. You have got to use the factors that the judge gives you, and decide who is telling the truth.
"And it is a two-part process. You recollect the evidence and then you evaluate it. He will tell you you can consider interest, bias, kinship, friendship, or the lack of it. That you can use your common sense and everyday understanding. And you decide what really happened the night of August the 16th, 1991. And you decide it, not based upon what I say, or what Mr. King, or any other lawyers say, but what comes to you from there. But I'll submit to you, that the little girl, she is not telling the truth. That is justI don't know how to put it in words. It is just a baldfaced lie. She just is not telling the truth." R. 1035, 1040-42.
A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial.
*611 "[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses." Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`Attempts to bolster a witness by vouching for his credibility are normally improper and error.' ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.... Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony."
United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
Here, the district attorney did not give any personal assurance of McCant's veracity and did not imply that he had information that had not been presented to the jury that supported McCant's testimony. "The credibility of a witness is a legitimate subject of criticism and discussion." Flint v. State, 370 So.2d 332, 335 (Ala.Cr.App.1979). Here, as in Smith v. State, 344 So.2d 1239, 1242 (Ala. Cr.App.), cert. denied, 344 So.2d 1243 (Ala. 1977), "[t]he prosecutor's remarks were grounded on some testimony given by the witness himself." See also Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (reference in closing argument to defendant as a "bald face liar" was "a hard blow but it was not foul").
We note that in his closing argument to the jury, defense counsel argued that "what the little girl said today is true" (R. 1016), and that McCants had "a tremendous reason to put this on somebody else" (R. 1023).
In connection with this issue, the appellant also argues that "[t]he district attorney improperly obtained the assurances of veniremembers, over defense objection, that they would believe the testimony of a co-defendant in the case." Appellant's brief at 21 n. 9. The record shows that during the voir dire of the venire, the district attorney asked:
"Do any of you, if any of these people who took part in the crime were called as a witness in this case, do you think the fact that they took part in the crime, that you just wouldn't believe them just because they took part in the crime? Is there any one of you who feels that way? Do any one of you feel that because they took part in the crime and they were called as a witness and they would receive a lesser sentence than what the defendant is being tried for? Is there any one of you that because of that fact, would not believe them, just strictly because of that fact." R. 80.
The prosecutor's inquiry was proper. See Ex parte Webb, 586 So.2d 954, 955 n. 1 (Ala.1991), noting the correctness of this Court's holding in Nodd v. State, 549 So.2d 139, 147 (Ala.Cr.App.1989), that "where the State's case consists primarily of police testimony and that testimony is crucial in establishing the State's case, the defense has a right to inquire, either through counsel or the trial judge, whether any member of the jury venire might be more, or less, inclined to credit the testimony of a police officer simply because of his or her official status."

I.
The appellant contends that the district attorney acted improperly during the penalty phase of the trial when he called as a witness the victim of a prior robbery committed by the appellant. Defense counsel did object to this victim identifying the appellant as the man who had robbed him. R. 1119.
At the sentence phase of the trial, the district attorney presented evidence that in September 1991, the appellant pleaded guilty and was convicted of robbery in the second degree. In order to prove this robbery conviction as an aggravating circumstance, see Ala.Code 1975, § 13A-5-49(2), the district attorney called three witnesses. An employee of the Jefferson County Circuit Clerk's *612 office identified the court "file" and the properly certified case action summary in that robbery case. The deputy district attorney who prosecuted the case corroborated the clerk's testimony and identified the prosecuting witness-victim in that case. The robbery victim and prosecuting witness identified the appellant as the person who had robbed him. The prosecutor did not elicit any details of the other robbery. See Dill v. State, 600 So.2d 343, 364 (Ala.Cr.App.1991) (holding that the details of the prior robbery were properly admitted "to show the violent nature of the offense"), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
There was no impropriety in the prosecutor's action. "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstance." Section 13A-5-45(e). Although a prior conviction may be proved by a properly certified case action summary without additional evidence, Sargent v. State, 515 So.2d 729 (Ala.1987), we know of and have been cited to no authority stating that a prior conviction may be proved only by such documentary evidence. We reject the appellant's assertions that in this regard the district attorney's actions were "highly improper and prejudicial" to the appellant, that those actions "created the distinct possibility that Derrick DeBruce's sentence was based upon caprice rather than reliable evidence," and that the other robbery "was not prove[d] by proper evidence." Appellant's brief at 26.

J.
We reject the appellant's allegation that the district attorney "engaged in a series of highly improper inflammatory arguments" during the sentence phase of the trial. Appellant's brief at 27.
1. In his sentence phase closing argument, the district attorney argued that the jurors had a "duty" to serve as jurors, and that they were selected "to do an obligation, to do a duty that you think is right." R. 1174. The prosecutor also told the jury: "I know without question that you will do what you think is right and just under the law" (R. 1176); "You render a verdict that you can live with based upon this evidence and based upon this law" (R. 1177); "It's your decision in this case. You do what you think is right. You do what you think is just and you do it in your heart, as he [defense counsel] said, and in your mind under the evidence and under the law, and then nobody can complain. You do what you think is right." R. 1179. Defense counsel did not object to these comments.
A review of the argument shows that the district attorney did not argue that the jury could fulfill its duty only by recommending a sentence of death. Here, the district attorney did not violate the principle that a "prosecutor is in error, in exhorting the jury to `do its job,' to imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law." Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (Ala.1991).
2. The district attorney did not commit error in stating, "I'll tell you this, if we can ask the young people of this country to die in defense of this country, then we also have the right to ask killers, merciless killers to die." R. 1175. Defense counsel made no objection to this particular statement. In Kuenzel, 577 So.2d at 504, this Court held that "[t]he prosecutor's argument that `if surely we have the right to ask young people to defend this country and our way of life, then we have the right to execute the worst of its criminals' did not go beyond the bounds of legitimate argument."
3. The district attorney did not commit error in his comment, "Folks, if there is one person in this courtroom that really and truly believes in capital punishment, it's that fellow seated right there." R. 1176. Defense counsel made no objection to this comment. In Haney v. State, 603 So.2d 368, 395 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), this Court found that "this line of argument is within the latitude allowed prosecutors in their exhortations to the jury to discharge its duties in such a manner as to punish crime, *613 protect the public, and deter others from committing like offenses."
4. In his closing argument, the district attorney urged the jury to "do what you think is right and just under the law.... That's all anybody has got a right to ask. But it is not right to come up here and put a guilt trip on you like that's just been done. [Defense counsel] says ... [i]f anything tugs at your heart, just do it. In effect, just disregard the law. Just disregard your oath to this Court." R. 1176-77. The district attorney's argument was a proper and legitimate response to defense counsel's previous statement:
"When you g[e]t back there and make your decision, if there's anything in this case that really tugs on your heart, then go with it. Go with it. Because that's what this is all about. If you've got something that is really bothering you on the inside about killing him, then go with that. You are entitled to your own opinion. You don't do it if you don't want to. If you don't feel like he needs to die, then don't kill him." R. 1172-73.
"[I]n California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court decided that `an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' 479 U.S. at 539, 107 S.Ct. at 838 (emphasis added)." Kuenzel, 577 So.2d at 496. A prosecutor's argument "in telling the jury not to let sympathy, emotions, or compassion affect its decision... did not result in any error." Stewart v. State, 601 So.2d 491, 506 (Ala.Cr.App.1992).
5. In his closing argument, the district attorney stated:
"But if you believe and we believe that a person has a right to kill a person for coming into their home to protect their children and family, and that's the law in the State of Alabama, then you must believe that society has that same right. Society has the right of self defense against people like Derrick DeBruce." R. 1177.
This argument was proper for the same reasons this Court upheld a similar argument in Kuenzel, 577 So.2d at 503. It does not imply that the appellant would commit illegal or dangerous acts in the future.

III.
The appellant contends that the search warrant for the search of his automobile was based on a false affidavit and was overbroad.
At trial, a number of items seized from a Chevrolet automobile belonging to the appellant were admitted into evidence. This vehicle was searched pursuant to a search warrant obtained by Talledega Police Detective Kenneth Sisk after the car had been impounded.
In securing a search warrant, Sisk executed an affidavit on August 24, 1991, in which he stated:
"1. The ... PLACE to be searched is in the City of Montgomery, State of Alabama, and is described as follows: A 1979 Chevrolet Caprice, 4-door, blue in color, with Alabama Tag 50AY-192, VIN: 1N69G9S166345 registered to Nila Clines at 1516 Patterson Street, Guntersville, Alabama. This vehicle was seized at 3513 Gaylord Place on 8/23/91 after being identified as being the vehicle used during the commission of the robbery/murder at Auto Zone in Talladega, Al."
". . . .
"Further probable cause being that this vehicle description and tag number were given to the Talladega, Alabama Police Department by a witness to the robbery/murder at the Auto Zone on 8/16/91.
". . . .
"The foregoing is based upon the personal knowledge of the affiant...." State's Exhibit 59, R. 687-88.
The municipal judge signed the search warrant at 6:35 p.m. on August 24, 1991. State's Exhibit 59, R. 689.
In his affidavit of September 11, 1991, in support of a second search warrant, Sisk stated:

*614 "That on 8-16-91, the Talladega Police Department was called to investigate the robbery of the Auto Zone Store in which a customer was shot and killed.
"Further Probable Cause Being that a 1979 Blue Chevrolet Caprice was used in the incident.
"Further Probable Cause Being that a blue 1979 Chevrolet Caprice bearing Alabama Tag 50AY-192 VIN 1N69G9S166345 was seized at 3513 Gaylord Place, Montgomery, Alabama on 8-23-91. This vehicle has been identified as being the vehicle used in the Robbery of the Auto Zone Store in Talladega, Alabama on 8-16-91.
". . . .
"The foregoing is based upon the personal knowledge of the affiant...." State's Exhibit 60, R. 698.
Both search warrants were obtained from the same municipal judge for the City of Montgomery. The trial judge found that "the search warrants, State's Exhibit No. 59 and 60 are facially legally sufficient, and the motion to suppress the items seized thereby is denied." R. 787.
The appellant maintains that both affidavits contain false information in that "[n]o witness to the robbery/murder in Talladega had identified this vehicle." Appellant's brief at 35. This specific objection was not a ground of any motion to suppress. We find the appellant's allegation only partially true and somewhat misleading in itself. We also find that some of the information contained in the affidavits is poorly alleged and that the affidavits do omit significant facts.
On August 23, 1991, Talladega Police Detective Tom Bowerman went to Montgomery and arrested Charles Burton for the first degree robbery of the Auto Zone. Before going to Montgomery, Bowerman had learned that Burton's fingerprints had been identified from the Auto Zone robbery. Additionally, on August 17, Bowerman had seen a videotape recording taken at 5:16 or 5:18 on the afternoon of August 16, 1991, at the Sylacauga City National Bank approximately two hours before the Auto Zone robbery. The video depicted the Chevrolet with distinctive wheel rims, the appellant, and Burton.
Sometime prior to August 23, Larry McCardle, the manager of Auto Zone, identified Burton in a photographic lineup as one of the robbers. Prior to leaving Talladega, Detective Bowerman met with other law enforcement officers in Birmingham and obtained information about the appellant and others "who were all part of a close knit group of people who were committing robberies" in Birmingham, Fultondale, and Sylacauga. R. 653-54. The Chevrolet described in the affidavits was depicted on the City National Bank video and "was associated with this group of people." R. 654.
Before traveling to Montgomery, Bowerman learned that a gold chain with a pendant in the shape of a pistol had been taken in a robbery in Jefferson County and that one of the suspects in the subsequent robbery of Stacy's Jewelers in Sylacauga, which occurred just before August 16, 1991, had such a pendant.
After arresting codefendant Burton at a bondsman's office adjacent to the Montgomery Police Department, Bowerman and other officers went to the residence of Barbara Jean Spencer on Gaylord Place in Montgomery. Bowerman observed a "two-tone blue Chevrolet" bearing a license plate that included "50AY" parked near that residence. R. 658. The appellant and Lujuan McCants were standing in front of that car. The appellant was wearing a gold pistol pendant around his neck. When Detective Bowerman approached, the appellant "dropped to his knees and went underneath the hood of the vehicle." R. 659. The detective retrieved a blue steel Bursa .380 semi-automatic pistol (State's Exhibit 56, R. 670) from underneath the hood of the Chevrolet. At that time, the appellant identified himself as "Derrick Miller," an identification Detective Bowerman knew to be false because he was familiar with a photograph of Derrick DeBruce. R. 683. A radio check for outstanding warrants revealed that Willie James Brantley, Barbara Jean Spencer (a.k.a. Juanita DeBruce (R. 678)), and the appellant were wanted for a Jefferson County robbery. R. 665, 675. Bowerman learned that a warrant charging *615 the appellant with first degree robbery in Jefferson County had been issued on August 23, 1991. R. 671. McCants, Brantley, Spencer, and the appellant were placed under arrest. At that time the Chevrolet was also seized. R. 704.
Brantley told the police that he was the "renter" of the residence and consented to a search of the Gaylord residence. R. 676, 681. Pistols, ammunition, and jewelry were recovered inside the house. When the police discovered the partially hidden jewelry in the backyard they "backed off" the search and obtained a search warrant. R. 683.
Detective Sisk testified that he arrived in Montgomery on August 23, 1991, and observed the Chevrolet in the driveway at Gaylord Place bearing license number 50AY192. R. 800. He had obtained the partial license tag "50AY" from Don Lewis the night of the Auto Zone robbery. Sisk admitted that initially Lewis only gave him a partial tag number but later, after Lewis was examined by a psychologist using a "method of relaxation" (R. 701), Lewis was able to supply the remaining numbers.
Talladega Police Communications Officer James Edward Smoot testified that on the night of the Auto Zone robbery he received a communication from Don Lewis complaining of an incident of reckless driving involving a "two-tone blue Regal or some GM model type vehicle" with the partial tag "50AY." R. 622.
Don Lewis testified that he was driving his vehicle near the Auto Zone about the time of the robbery/murder. He was almost hit by a car being driven recklessly. He testified that he gave the police the partial tag number "50AY" and described the vehicle as "a large medium size car, not large like a Cadillac, but a medium size, dark in color, four door that had approximately five to six passengers." R. 558.
From the record, it is clear that the police had already impounded the appellant's Chevrolet when the search warrants for that automobile were obtained. It is also clear that the police had probable cause to arrest the appellant and to search his automobile without a search warrant. The police could have searched the Chevrolet under the automobile exception to the warrant requirement, Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Reis, 906 F.2d 284, 290-91 (7th Cir.1990); or under the inventory exception, Ex parte Boyd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).
Under the circumstances of this case, the faults in Detective's Sisk's affidavits are best characterized as negligent rather than knowing and intentional or made with reckless disregard for the truth. "There must be allegations of deliberate falsehood or of reckless disregard for the truth.... Allegations of negligence or innocent mistake are insufficient." Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).
Here, the inaccuracies and omissions in the affidavit did not mislead the magistrate. Had Detective Sisk accurately and specifically set out all the facts and circumstances within his knowledge, a much stronger and clearer finding of probable cause would have been justified. "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984). "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." 468 U.S. at 926, 104 S.Ct. at 3422.
The appellant also argues that the search warrant was invalid because it gave the executing officers "virtually unlimited discretion to decide what to seize." Appellant's brief at 37. The appellant's objection is directed to the search warrant of August 24, 1991, which authorized the search of the Chevrolet automobile. That vehicle was specifically described in the search warrant. The warrant contained the following description *616 of the property to be searched for and seized:
"The PROPERTY to be searched for and seized, if found, is specifically described as follows: Any and all .380 handguns, Any and all .380 ammunition, Any and all other firearms and ammunition, Any other evidence related to the robbery/murder that occurred at the Auto Zone in Talladega, Alabama on 8/16/91, Any and all evidence, primarily jewelry that was taken in armed robberies of Pawn Shops in Fultondale, Alabama, and Birmingham, Alabama, and during an armed robbery of a jewelry store in Sylacauga, Alabama." State's Exhibit 59.
This description was not impermissibly vague or overbroad.
"The most frequently quoted statement of these purposes [underlying the Fourth Amendment requirement of particularity] is that in Marion [Marron] v. United States [275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927)]: `The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and presents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' In some respects that language is misleading, for to the extent that it suggests that the police may never seize an object unless it is named in the warrant, it is incorrect. 2 W. LaFave, Search and Seizure § 4.6(a) at 234 (2d ed. 1987).
"Thus, although it may be better to describe a gun by brand and serial number, a warrant for a murder weapon which simply referred to `any .22 caliber pistol' was sufficient because it was as complete a description as could reasonably be expected from the murder investigation. But mere reference to `the weapon used in the armed robbery' is too vague, as `weapon is a generic term that could apply to a variety of instruments,' and the robbery victim could surely be more specific as to the kind of weapon used.
"Sometimes a warrant will not attempt to describe instrumentalities except by reference to the criminal conduct in which they have been used. Such descriptions as `various instruments and tools used in performing an abortion' and `instrumentalities of the commission of the crime of conducting an illegal gambling business' have been upheld."
2 W. LaFave, § 4.6(d) at 247 (footnotes omitted). "A greater degree of ambiguity will be tolerated when the police have done the best that could be expected under the circumstances, by acquiring all the descriptive facts which reasonable investigation of this type of crime could be expected to uncover and by ensuring that all of those facts were included in the warrant." 2 W. LaFave § 4.6(a) at 238. Here, the description of the things to be seized was constitutionally sufficient. See Wamble v. State, 593 So.2d 109, 110 (Ala.Cr. App.1991).

IV.
The record does not support any finding that the veniremembers discussed the merits of the case in violation of the instructions of the trial court.
Shortly after the voir dire of the venire had begun, the district attorney asked, "How many of you either read about, heard about it [the Auto Zone murder/robbery], somebody talking about or read it in the newspaper or whether it be on radio or TV?" R. 136-37. In response veniremember Terry Mooney stated: "Just heard about it today, people talking about it." R. 137-38.
Then, on individual voir dire of Mooney, the following occurred.
"MR. MATHIS [defense counsel]: Mr. Mooney, you indicated a little while ago that you heard some folks talking about this case and that you overheard some folks talking about it today.
"JUROR MOONEY: It was today that I heard it.
"MR. MATHIS: Okay. What did you hear?
"JUROR MOONEY: Well I just heard them sayingwe were all talking about we kind of dreaded getting on the case because it is such a serious matter, you know. *617 That's just basically what it was and then what the Judge told us too.
"MR. MATHIS: Is that the way you feel about it, that you dread getting on it because it is such a serious case?
"JUROR MOONEY: Well, I feel like it is my civil duty to serve. To be honest with you, I don't mind doing it, but I realize the seriousness of it. It is a man's life was taken.
"MR. MATHIS: I don't have any more questions." R. 171-72.
Mooney then indicated that he could make a decision based upon an application of the instructions of the trial court to the testimony presented at trial. Defense counsel made no objection and did not raise or pursue this issue at trial.
We reject the appellant's argument on appeal that Mooney's comments show that the veniremembers were discussing the facts of the case outside the courtroom and in violation of the instructions of the trial court. There is simply no evidence to support that inference from Mooney's comments indicating that "some folks" were concerned about the "seriousness" of the case. We interpret his comments to mean that some veniremembers were aware of the fact that this was a capital case involving the death of one man, the victim, and the possible death of another, the appellant.

V.
At closing argument in the sentence phase, the trial court refused to allow defense counsel to read to the jury quotations from resource materials contained in his "motion to bar the death penalty as cruel, unusual and degrading punishment." CR. 78-95, R. 1085-88, 1123-24. Those quotations graphically describe what physically happens to the human body when it is electrocuted. Those quotations were to demonstrate, in vivid and hideous detail, that death by electrocution is extremely vicious, barbaric, and torturous.
At trial, defense counsel sought only to be permitted to read from his motion. Contrary to the appellant's argument on appeal (Appellant's brief at 39), there was no attempt to offer any evidence on this issue.
The trial court properly refused to allow defense counsel to present this argument to the jury. The manner in which the death sentence is carried out is not an issue for the jury.

VI.
The trial court's instruction on reasonable doubt did not violate the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
The trial court gave the following instructions to the jury in the guilt phase of the appellant's trial:
"A reasonable doubt means an actual doubt. It could arise out of the testimony in the case, or it could arise from a lack of testimony in the case.
"It is a doubt for which a reason can be assigned, and the expression to a moral certainty means practically the same thing as beyond a reasonable doubt, because if you are convinced to the point where you no longer have a reasonable doubt, then you are convinced to a moral certainty." R. 1068-69.
Defense counsel announced "[s]atisfied" at the conclusion of these instructions. R. 1073. At the sentence phase of the trial, the trial court instructed the jury that "[t]he same definitions that I gave to you yesterday in the guilt stage concerning reasonable doubt apply to this matter also." R. 1187. Defense counsel made no objection to either instruction, and in fact, in his closing argument to the jury in the guilt phase, used terminology identical in all practical respects to that employed by the trial court.[6]
*618 A similar issue was recently addressed by the Alabama Supreme Court in Ex parte McWilliams, 640 So.2d 1015, 1024 (Ala.1993):
"We first note that `beyond a reasonable doubt' and `to a moral certainty' are not exactly synonymous. In Ex parte Beavers, 598 So.2d 1320, 1321 (Ala.1992), this Court approved a jury instruction that included the following:
"`"And the expression `to a moral certainty' means practically the same thing as beyond a reasonable doubt. Because if you are convinced to a point where you no longer have a reasonable doubt, then you are convinced to a moral certainty."'
"(Emphasis added.) In other words, `moral certainty' is the state a jury reaches when it is convinced of the defendant's guilt beyond a reasonable doubt. We further note, however, that the trial court equated the two phrases only once, at the beginning of his introductory charge to the jury. Moreover, as set out below, the trial court's instruction, taken as a whole, does not suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. Accordingly, we hold that this error in the trial court's instruction [that a reasonable doubt and to a moral certainty are `synonymous'] is harmless. Rule 45, A.R.App.P.
". . . .
"In Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), the United States Supreme Court reversed a criminal conviction, holding that the trial's instruction on reasonable doubt violated the defendant's due process rights. The trial court in that case had equated reasonable doubt with `actual substantial doubt' and had instructed the jury that a reasonable doubt `must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.' Cage v. Louisiana, 498 U.S. at 40, 111 S.Ct. at 329, 112 L.Ed.2d at 342 (quoting State v. Cage, 554 So.2d 39, 41 (La.1989)). The trial court in Cage further instructed the jury that `What is required is not an absolute or mathematical certainty, but a moral certainty.' Id. The United States Supreme Court concluded that `the words "substantial" and "grave" ... suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.' Cage v. Louisiana, 498 U.S. at [41], 111 S.Ct. at 329, 112 L.Ed.2d at 342. It then held that, considering the use of those words in conjunction with `moral certainty,' a reasonable juror could have understood the instruction as allowing `a finding of guilt based on a degree of proof below that required by the Due Process Clause.' Id. (footnote omitted.)
"`In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole.' Id. (citing Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985)). Having compared the instructions at question in Cage and those in the present case, we find that the instruction given here does not contain the same infirmity as that in Cage. Specifically, the instruction in the present case does not require `a grave uncertainty' for acquittal."
See also Ex parte Adkins, 600 So.2d 1067, 1069-71 (Ala.1992); Ex parte Beavers, 598 So.2d 1320, 1324 (Ala.1992); Ex parte White, 587 So.2d 1236, 1237 (Ala.1991).

VII.
The appellant's conviction is not due to be reversed because of the appellant's absence from a pretrial hearing at which a number of motions were considered.
The appellant's trial began on February 10, 1992. A motion hearing was held on January 31, 1992. Apparently that motion hearing involved both this appellant and codefendant Charles Burton. See R. 58.
At that hearing the following motions were discussed: 1) motion for ballistics testing and for fingerprinting; 2) motion to proceed in forma pauperis ("for purposes other than payment of counsel," R. 9);[7] 3) motion for *619 psychological evaluation;[8] 4) motion to prohibit death-qualification of prospective jurors or for separate juries for the guilt and, if necessary, the sentence phases of the trial; 5) motion for witness list; 6) motion in limine (to prohibit comment on possibility that the appellant could be released at some time in the future if found guilty of a lesser included offense); 7) motion for discovery of impeaching testimony; 8) motion to suppress;[9] 9) motion for aggravating and mitigating circumstances; 10) motion for individual voir dire and sequestration of the jury; 11) motion for discovery; 12) motion for examination of exhibits; 13) motion for complete recordation and for daily transcripts during the trial; 14) motion for production of negatives; 15) motion to exclude or to substitute gruesome photographs; 16) motion to require disclosure of any and all information concerning prospective jurors which may be favorable to the defense; 17) amended motion to suppress;[10] 18) motion for grand jury transcript; 19) motion to dismiss the indictment on account of discrimination in the selection of the grand jury foreperson and motion for discovery of grand jury foreperson data; 20) motion to disqualify all potential jurors that knew or were acquainted with the victim or his family; 21) motion for introductory instructions, for an order requiring submission of proposed jury instructions when trial begins and a copy of the charges to be provided to each juror; 22) motion to preclude the death penalty on the grounds of racial discrimination and for discovery; 23) motion to bar the death penalty as cruel, unusual, and degrading punishment; 24) motion to prohibit the district attorney from exercising discriminatory peremptory challenges and for discovery; 25) motion to invoke the rule prior to voir dire; 26) motion to sequester jurors prior to and during the trial of this case; and 27) motion and trial memorandum of points and authorities in support of all motions, objections, exceptions, requests, and other applications and issues of any nature whatsoever. After discussing these motions filed by the appellant, the trial court had a brief discussion with defense counsel for codefendant Charles Burton concerning motions he had filed. R. 58-64.
Defense counsel never objected to the appellant's absence.
Rule 9.1, A.R.Crim.P., provides:
"(a) Right to be Present. The defendant has the right to be present at the arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing.
"(b) Waiver of the Right to be Present.
"(1) Except as provided in subsection (2), a defendant may waive the right to be present at any proceeding in the following manner:
". . . .
"(2) A defendant may not waive the right to be present if:
"(i) The defendant is charged with an offense which may be punishable by death...."
*620 In Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App.1992), this Court held that in a capital case, "if the appellant's presence, in the present case, would have been useless to her defense and if the [pretrial] hearing was not considered to be a `critical stage' of her trial, then we can find no error in the appellant's absence from the hearing." Here, as in Harris, "[t]he appellant has been unable to suggest or demonstrate any possibility of prejudice resulting from [his] absence." Id.
Furthermore, although the case of Ex parte Stout, 547 So.2d 901 (Ala.1989), was a noncapital case, we find it relevant to the extent that, if error was committed in this case, that error was harmless.
"Violations of some constitutional rights may be considered harmless error....
"`Moreover, even improper exclusion of a defendant from a "critical" portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt.'
"Polizzi v. United States, 550 F.2d 1133, 1138 (9th Cir.1976)."
Stout, 547 So.2d at 904. Although this Court is extremely reluctant to make a finding of harmless error in any case in which the death penalty has been imposed, here it is clear beyond any reasonable doubt that the appellant's absence at the pretrial hearing on various legal motions in no way prejudiced him. Here, as in Ex parte King, 564 So.2d 928, 931 (Ala.1990), the "hearing necessitated only arguments of law."

VIII.
We agree with the trial court in its finding that the appellant failed to prove a prima facie case of racial discrimination necessary to a claim under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The record shows that there were 16 black veniremembers; that the State removed five blacks; that the defense removed four blacks; that six blacks (50%) sat on the jury; that none of those six were alternates; and that blacks composed 28-30% of the population of Talladega county.
"[A] defendant cannot prove a prima facie case of purposeful discrimination solely from the fact that the prosecutor struck one or more blacks from his jury. A defendant must offer some evidence in addition to the striking of blacks that would raise an inference of discrimination. When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing discriminatory impact then it should also be available to show the absence of a discriminatory purpose."
Harrell v. State, 571 So.2d 1270, 1271-72 (Ala.1990) (emphasis and citations omitted), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). See also Ex parte McWilliams, 640 So.2d 1015 (Ala.1993).
We note that with the single exception of Walker v. State, 611 So.2d 1133 (Ala.Cr.App. 1992), this Court has found that the peremptory strikes against black veniremembers exercised by this particular district attorney or his assistants have been race neutral.[11]

IX.
The trial court did not abuse its discretion in allowing William E. Kallenback to be seated on the trial jury in spite of his alleged "extensive exposure to media stories regarding the case." Appellant's brief at 49.
*621 The record does not support the appellant's allegation of "extensive exposure." What the record does show is that during individual voir dire, Mr. Kallenback admitted that he had "read in the Talladega paper a couple of articles about the case." R. 252.
"The main thing I remember is, you know, about the person that was killed, not really the defendant.... I just remember he [the victim] was traveling through town and stopped in a place to buy some parts and was killed there.... That's my main memory. I saw it also on television. That's my main memory. I do remember some later articles about the arrests and that, but I really didn't pay any attention. I didn't recognize any of the names or anything." R. 252-253.
Defense counsel did not object to or challenge this veniremember. R. 271. There is no "plain error" in this regard. "It is not required ... that jurors be totally ignorant of the facts and issues involved." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

X.
The appellant's conviction is not due to be overturned because of the district attorney's tardy disclosure of a statement made by the appellant to Officer Shawn Smith of the Montgomery Police Department.
The record shows that the appellant made an oral statement to Officer Smith after signing a written waiver of rights form. In that brief statement, the appellant told Smith that McCants was the shooter in the robbery, that Burton set it up, and that McCants was "about I guess 17, 15. Something like that." R. 766. At the hearing on the motion to suppress, the appellant testified that this "wasn't a statement. We was just talking." R. 766. He testified further that "[i]t wasn't a statement, but I talked to him.... That wasn't a statement, but I told him." R. 768.
The substance of the statement to Officer Smith was included in a statement the appellant gave to Detective Bowerman "within an hour." R. 771, 944. In his brief, the appellant acknowledges that "[t]he substance of the undisclosed recorded statement was included in a later statement given by Mr. DeBruce to other law enforcement officers. (R. 771)." Appellant's brief at 51.
During the course of the trial, a hearing was held outside the presence of the jury on the appellant's motion to suppress the recorded statement given to Detective Bowerman. During that hearing, the district attorney used the appellant's written waiver and oral statement to Officer Smith to impeach the appellant's testimony on direct examination. When defense counsel complained that the existence of that oral statement had not been disclosed to him, the prosecutor maintained that he had just been provided that information himself.[12]
It is undisputed that the district attorney had an "open file policy" in this case, see generally Ex parte Monk, 557 So.2d 832 (Ala. 1989), and that he did provide defense counsel with a copy of everything in his files. R. 774. Defense counsel readily acknowledged that he had received a copy of the signed *622 written waiver form given to Officer Smith. R. 770, 774.
After the State had rested its case, the trial court assured defense counsel:
"If the only reason you are not going to call the [appellant] is because of his testifying relative to this statement and maybe getting into some inconsistencies, I'll see to it that nothing will come out if he is put on the stand relative to this by way of cross examination by the state.... I want to tell you that if that's the only reason you've got for not putting your client on, then please understand that this Court will insulate him from any difficulty that may arise out of his testimony relative to the statement by way of appropriate instructions of limitations to the state, unless you were to go into it and open it up." R. 947-48.
In Coral v. State, 628 So.2d 954, 979-80 (Ala.Cr.App.1992), this Court held:
"In Brady v. Maryland, 373 U.S. [83] at 87 [83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)], the Supreme Court held that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' To establish a Brady violation, a defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975 [106 S.Ct. 340, 88 L.Ed.2d 325] (1985). `Materiality' requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A `reasonable probability' is one sufficient to undermine confidence in the result. Pennsylvania v. Ritchie, 480 U.S. 39 [107 S.Ct. 989, 94 L.Ed.2d 40] (1987); United States v. Bagley, 473 U.S. 667 [105 S.Ct. 3375, 87 L.Ed.2d 481] (1985); United States v. Burroughs, 830 F.2d 1574 (11th Cir.1987), cert. denied, Rogers v. United States, 485 U.S. 969 [108 S.Ct. 1243, 99 L.Ed.2d 442] (1988); Ex parte Dickerson, 517 So.2d 628 (Ala.1987); Thompson v. State, 581 So.2d 1216 (Ala.Cr. App.1991).
"Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial. United States v. Gordon, 844 F.2d 1397 (9th Cir.1988); United States v. Shelton, 588 F.2d 1242 (9th Cir.1978), cert. denied, 442 U.S. 909 [99 S.Ct. 2822, 61 L.Ed.2d 275] (1979); Ex parte Raines, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103 [103 S.Ct. 1804, 76 L.Ed.2d 368] (1983); McClain v. State, 473 So.2d 612 (Ala.Cr.App.1985). A delay in disclosing Brady material requires reversal only if `the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial.' United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924 [96 S.Ct. 2634, 49 L.Ed.2d 379] (1976))."
Here, there is no probability that the jury would have resolved the appellant's case differently had the State disclosed the oral statement on a timely basis. Here, as in Coral, "[t]he untimely disclosure could not have had any effect whatsoever on the outcome of the case."
Furthermore, in this case the trial court took corrective action in order to ensure that the appellant would not be prejudiced by the delayed disclosure. See Rule 16.5, A.R.Crim. P.; Blackmon v. State, 574 So.2d 1037, 1040 (Ala.Cr.App.1990); McLemore v. State, 562 So.2d 639, 645-46 (Ala.Cr.App.1989).

XI.
The appellant maintains that Larry McCardle's in-court identification of the appellant was "tainted and rendered unreliable by Mr. McCardle's exposure to newspaper photographs identifying Derrick DeBruce as one of the men arrested in connection with the robbery." Appellant's brief at 56. Defense counsel did not move to suppress Mr. McCardle's in-court identification of the appellant *623 and we find no "plain error" in this regard.
McCardle was the manager of the Auto Zone. He testified that he had not identified the appellant in two photographic lineups conducted by the police. He testified that he had seen only one photograph of the appellant in a newspaper article "[i]dentifying him as someone who had been arrested," and that he did not keep or refer back to that photograph. R. 552-53. When asked, "Is your identification of him based upon your opportunity to observe him back on August 16, 1991 at the Auto Zone?" McCardle replied, "There is no question in my mind whatsoever." R. 553.
"The fact that the witness was unable to make an identification of the defendant from the photographic line-up ... does not require the exclusion of his in-court identification, but rather goes to the weight and credibility of his testimony." Carter v. State, 406 So.2d 1076, 1077 (Ala.Cr.App.1981). "`[A] witness's prior inability to identify a defendant goes to the credibility of the in-court identification and not to its admissibility, and thus raises a proper question of fact for the jury to determine.'" Johnson v. State, 453 So.2d 1323, 1328 (Ala.Cr.App.1984).

XII.
As required by Rule 45A, A.R.App.P., this Court has searched the record for "any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court." We have found no plain error in either the guilt or sentence phases of the appellant's trial. We have addressed all the issues raised on appeal and have found no reversible error.
In addition, we have found no error in the sentence proceedings adversely affecting the rights of the appellant. We find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and that death is the proper sentence in this case. Ala.Code 1975, § 13A-5-53(a).
In determining that death is the proper sentence, we make the following specific findings pursuant to Ala.Code 1975, § 13A-5-53(b)(1), (2), and (3): 1) There is no indication or inference in this record that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. 2) Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence.[13] 3) The appellant's sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. As this Court stated in Kuenzel, 577 So.2d at 530: "As was noted in Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980), two-thirds of Alabama death sentences are for robbery-murder. Although we have reviewed `worse' crimes of robbery-murder, the apparent cold-blooded, senseless, and unmerciful manner in which the defendant executed this crime impresses this Court as it did the trial judge. Other than the general arguments for not imposing a punishment of death in any case, we find no reason to spare the defendant's life."
Therefore, upon finding that the appellant received a fair trial, the judgment of the circuit court, as to both conviction and sentence, is affirmed.
AFFIRMED.
TAYLOR, PATTERSON and McMILLAN, JJ., concur.
MONTIEL, J., dissents with opinion.
*624 MONTIEL, Judge, dissenting.[14]
I dissent from the majority's holding in part VII of the opinion that the appellant's absence from a pretrial hearing and a number of motion hearings is not reversible error. I adhere to my dissent in Harris v. State, 632 So.2d 503 (Ala.Crim.App.1992).
NOTES
[1] Those individuals were identified as the appellant, Willie Brantley, Charles Lee Burton, Andre Lee Jones, Deon D. Long, and Lujuan Collin McCants.
[2] The trial court stated that there was "no question" that these photographs were "mug shots." R. 404.
[3] These witnesses were: Willie Davis, Roy Highfield, Larry McCardle, David Walton, and James Wilson. R. 404.
[4] There was no significant objection raising this issue before the trial court. See R. 628, 803, 804. However, on one occasion in response to defense counsel's objection, the trial judge instructed the district attorney: "Don't lead the witness." R. 803.
[5] There was evidence that as the police approached the appellant, the appellant placed a blue steel .380 semi-automatic pistol underneath the hood of a car. That pistol was not the murder weapon, which was positively identified as a silver or chrome .380 semi-automatic pistol. In his closing argument to the jury, defense counsel argued: "It seems logical to me that we ought to be able to assume that [the empty pistol found under the hood of the car was] what [the appellant] was toting when he was down there a few days later, and that's probably what he had in his hands when he was up here at the Auto Zone, as the evidence will recall." R. 1014.
[6] In his argument, defense counsel stated:

"Of course, the burden of proof and reasonable doubt are all wadded up together. Because the burden of proof is on the State of Alabama... to prove my client guilty beyond a reasonable doubt and to a moral certainty. And Robert [the district attorney] said that was likely so, in his opening the other day. That beyond a reasonable doubt and to a moral certainty are really the same thing. If you feel morally certain, inside your heart, that you are right, you ought to go ahead. If you don't, then you shouldn't. The same thing goes, if you have got a doubt to which you can attach a reason, then you have a reasonable doubt, then you should not find him guilty." R. 1021-23.
[7] "THE COURT: He hasn't filed the required form, but you can get that done this afternoon sometime.

"MR. MATHIS [defense counsel]: Yes, sir." R. 50.
[8] Defense counsel stated: "I filed that motion, Your Honor, based on some information I was given by this defendant's mother prior to having the opportunity to speak at length with him. I have spoke[n] with him many times. My understanding is that in order to be able to go forward on such a motion, I'm going to have to affirmatively show that there is some reason for it. I am not prepared to make such a showing. I'm certainly not prepared to make such a showing without him being here and chances are we wouldn't be able to if he was here.... Chances are we wouldn't be able to if he was here. The motion pretty much speaks for itself when it uses the terms, `may,' `may not,' and `may' as opposed to ... I don't believe it is necessary." R. 12. When asked by the trial court, "You don't know of any reason why we need to have a hearing at this time on it?" defense counsel replied, "No, sir." R. 13.
[9] From the record:

"THE COURT: Motion to suppress is the next matter.
"MR. MATHIS: We are not going to be able to do anything on that without him here, Judge.
"THE COURT: All right, we will carry this over, either later on this afternoon or sometime during the trial."
"MR. MATHIS: Yes, sir." R. 25-26.
[10] "THE COURT: The next matter is amended motion to suppress. Put that on hold for right now." R. 44.
[11] See Davis v. State, 593 So.2d 145, 147-48 (Ala.Cr.App.1991); Henderson v. State, 584 So.2d 841, 845-47 (Ala.Cr.App.1988) (death penalty case), 584 So.2d 862 (Ala.1991); Gaston v. State, 581 So.2d 548, 549-50 (Ala.Cr.App.1991); Kuenzel v. State, 577 So.2d 474, 485-486 (Ala.Cr.App. 1990) (death penalty case), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Andujar v. State, 572 So.2d 1319, 1320-21 (Ala.Cr.App.1990); Beavers v. State, 565 So.2d 688, 690 (Ala.Cr.App. 1990); Wilson v. State, 571 So.2d 1237, 1248-50 (Ala.Cr.App.1989) (death penalty case), reversed on prosecutor's impermissible comment of defendant's right not to testify, 571 So.2d 1251 (Ala. 1990); Borden v. State, 523 So.2d 508, 510-11 (Ala.Cr.App.1987).
[12] Exactly how the district attorney learned of the appellant's oral statement is not disclosed in the record. During the course of his cross-examination of the appellant at the suppression hearing, the district attorney represented to the court that he had not talked to anyone from the Montgomery Police Department and that he had been unaware that the appellant had given a statement to officer Smith "until just a few minutes ago." R. 769. The district attorney further stated:

"I had no knowledge that even a statement existed to Shawn Smith. There were no notes in Montgomery's file that Shawn Smith had even talked to him. There w[ere] no notes in Tallageda P.D.'s file. We gave him a copy of the Miranda. We told Montgomery to provide us with everything they had. They gave it to us and we gave it to them [the defense], everything that is in our file." R. 946.
Even defense counsel recognized that
"it is a common practice in all the jurisdictions where I have practiced law and also in those where I've been a police officer, that a defendant or a potential witness be Mirandized by everybody that just about comes in contact with themthat by [and] large those right waivers do not indicate that a statement is made. They are merely to show that the police officer acted with due regard to the rights of that defendant. They are not indicative of a statement. Many, many times there are two and three and four Miranda right waiver forms and only one statement." R. 945.
[13] The trial court found the existence of two aggravating circumstances: 1) a previous conviction "of a felony involving the use or threat of violence to the person, namely Robbery, 2nd Degree"; and 2) "[t]he capital offense was committed while the defendant was engaged in the commission of ... a robbery." CR. 250-51. Ala.Code 1975, § 13A-5-49(2) and (4).

The trial court found the existence of only one statutory mitigating circumstance: "the age of the defendant." CR. 252. Ala.Code 1975, § 13A-5-51(7). The trial court specifically stated that, after "a diligent search," it found "no other, statutory or non-statutory" mitigating circumstance. CR. 252.
[14] Although Judge Montiel was not present at the oral argument of this case, he has listened to the tapes of the argument.